L. D. PERRY and MARY JEAN PERRY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
PERRY v. COMMISSIONER
Docket No. 2624-76.
United States Tax Court
T.C. Memo 1978-451; 1978 Tax Ct. Memo LEXIS 64; 37 T.C.M. (CCH) 1847-44; November 8, 1978, Filed *64 L. D. Perry maintained various business interests from 1968 through 1970 but failed to report all his income from such businesses on his Federal income tax returns for such years. Held: (1) L. D. Perry grossly understated his income each year from 1968 through 1970; (2) some part of the underpayment for each of the years at issue was due to L. D. Perry's fraud with intent to evade tax within the meaning of sec. 6653(b), I.R.C. 1954; and (3) respondent failed to prove that any part of the underpayment was due to fraud on the part of Mary Jean Perry. Stephen K. Miller and F. Pen Cosby, for the petitioners. Robert P. Ruwe and Mark E. O'Leary, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies and additions to tax in petitioners' Federal income taxes: Addition to Tax Year
Deficiency
Sec. 6653(b) [1]
1968
$ 58,400.39
$ 29,200.20
1969
51,724.21
25,862.11
1970
36,004.28
18,002.14
After concessions, the issues are: (1) whether petitioners understated their income by $108,279.54, $86,363.72, and $70,614.35 in 1968, 1969, and 1970, respectively; and (2) whether any part of the underpayment of taxes for the years in issue was due to fraud with intent to evade tax by either of petitioners within the meaning of section 6653(b). FINDINGS OF FACT Some facts were stipulated and are found accordingly. L. D. Perry and Mary Jean Perry, husband and *66 wife when the returns and petition in this case were filed, resided in Indianapolis, Indiana, when they filed their joint Federal income tax returns for 1968, 1969, and 1970, with the Internal Revenue Service Center, Cincinnati, Ohio, and when they filed their petition in this case. Petitioners, cash method taxpayers, were divorced in 1975. In 1944, L. D. Perry started a used automobile sales business known as Perry Auto Sales. In 1955, he purchased a 51 percent interest in Smart & Perry, Inc., an Indiana corporation owning a Ford dealership. At that time, Ford objected to L. D. Perry owning and operating the competing Perry Auto Sales. As a result, he changed the name to Garfield Auto Sales to disguise his ownership. Garfield Auto Sales was not successful without his continuing supervision so L. D. Perry terminated the business by selling his inventory of used cars and collecting the open accounts on automobiles already sold. Smart & Perry, Inc., reported gross sales of $6,446,805.45, $7,720,175.70, and $6,796,256.31 in its fiscal years 1968, 1969, and 1970, respectively. In each of the years in issue, L. D. Perry maintained the following additional business interests: *67 50 percent stockholder in Mark-Lee, Inc., a company which leased business property to Smart & Perry, Inc.; 50 percent stockholder in Ford City Leasing, Inc., an automobile leasing company; a shareholder in Preferred Credit, Inc., an automobile finance company; 100 percent stockholder in Perry-Simpson Corporation, a company primarily engaged in the apartment rental business. Mark-Lee, Inc., reported gross rental income of $31,000 and $42,000, respectively, on its fiscal 1968 and 1969 returns. Ford City Leasing, Inc., reported gross rental income of $111,660.86 and $127,189.38, respectively, on its fiscal 1968 and 1969 returns. Preferred Credit, Inc., reported gross interest and insurance commission income of $26,337.35 and $24,765.46, respectively, on its fiscal 1968 and 1969 returns. perry-Simpson Corporation reported gross rental income of $41,285.43, $74,070.48, and $103,313.80, respectively, in 1968, 1969, and 1970. Prior to November 1967, Smart & Perry, Inc., leased business property from Mark-Lee, Inc., for $3,000 a month. From November 13, 1967 to April 17, 1969, the monthly rental payment was increased to $4,000. L. D. Perry instructed his daughter to cash each monthly *68 rental check and to give him $1,000 cash. Mark-Lee, Inc., continued to report a $3,000 monthly rental income from the arrangement. Pursuant to a Federal tax audit, the taxable rental income of Mark-Lee, Inc., for its years ended October 31, 1968 and 1969, was increased by the additional $1,000 rent.The parties agreed to these adjustments. Respondent also determined that petitioners' daughter should include the additional $1,000 unreported rent in her joint income with her husband. The parties agreed to this adjustment. In the years in issue, petitioners made several large purchases, most of which were consummated by and through checking and savings account transactions. In 1968, petitioners purchased an Indiana farm for $75,000. This was paid in installments from May 22, 1968 to September 9, 1968, by checks drawn on various checking accounts at the National Bank of Greenwood. On May 22, 1968, when the initial farm payment was made, petitioners had $81,085.26 in various savings accounts. On September 9, 1968, petitioners transferred $46,000 from these savings accounts to their checking accounts at National Bank of Greenwood. On September 9, 1968, immediately after the *69 final farm payment was made, the balance in the same savings accounts was $27,804.44. On April 2, 1969, petitioners purchased a houseboat for $21,840. The boat was paid for by check. On August 31, 1969, petitioners sold the boat for $19,257. On April 2, 1970, petitioners purchased another houseboat for $25,104. At least $17,600 of the purchase price was paid in cash. On August 21, 1969, petitioners purchased a motorcycle for $2,124.27 which was paid by check. On June 2, 1970, petitioners purchased another motorcycle for $2,448 which was also paid for by check. During 1970, petitioners also purchased rental property for $6,263.59 which was paid for by check. On August 2, 1965, petitioners executed and signed a loan application to obtain a $30,000 loan which was to be secured by their residence at 802 East Southport Road, Indianapolis, Indiana. The residence was purchased for a total price of $30,000. L. D. Perry asserted on the application that he had $9,000 cash on hand and in the bank as of August 2, 1965. The purpose of the loan was to refinance petitioners' existing residential mortgage and allow additional funds to build a lake cottage. On August 12, 1965, L. *70 D. Perry executed an installment note for $25,000 plus interest to purchase Perry-Simpson, Inc. stock. L. D. Perry made several loans during the years in issue to family, friends, and his businesses. For the most part, the loans were made by check. The largest loan was a May 11, 1970, loan of $25,000 to Smart & Perry, Inc., who repaid $15,000 by November 21, 1970. This payment was deposited in one of petitioners' checking accounts. In addition to the cash in the bank and otherwise on hand necessary to make the above purchases and loans, L. D. Perry maintained a constant supply of $20,000 cash on hand throughout 1968, 1969, and 1970. Also, from 1958 through January 1, 1969, Smart & Perry, Inc., put about $200 a week into a joint savings account between Jack Smart and petitioner. The purpose of the fund was to provide for expenses and emergencies. Petitioners' Federal income tax returns for 1968 and 1969 were prepared by an accountant, now deceased, from records and information supplied him by L. D. Perry. The accountant did not maintain books and records for petitioners. An attorney prepared petitioners' 1970 Federal income tax return from records and information supplied *71 him. Petitioners' daughter did not maintain any formal books and records for petitioners in 1968, 1969, and 1970. Using the net worth method which reflected no cash on hand for the years in issue, respondent determined that petitioners had understated their taxable income in 1968, 1969, and 1970 by $108,279.54, $86,363.72, and $70,614.35, respectively. OPINION Issue 1: Deficiencies
The first issue we must decide is whether petitioners had unreported income in each of the years in issue. Because of the inadequacy of the petitioners' records, respondent reconstructed their income for such years using the net worth method. See secs. 6001, 446; sec. 1.446-1, Income Tax Regs.
In using the net worth method, respondent first attempts to establish the taxpayer's net worth at the beginning of a given year. He then computes increases in the taxpayer's net worth in each succeeding year under examination by calculating the difference in the taxpayer's net worth at the beginning and the end of each year. To these increases certain adjustments are made including the addition of nondeductible expenditures, such as living expenses. If the total increases in net worth are substantially *72 greater than the taxable income as reported by the taxpayer, respondent claims the excess is unreported taxable income, unless it can be traced to a non-taxable source (such as a cash hoard, gifts, inheritances, etc.). Petitioners do not question the propriety of using this method to reconstruct their income. Instead, they challenge respondent's conclusion that there existed an increase in net worth during each of the years at issue. Petitioners contend that a secret cash hoard of approximately $300,000 on hand at January 1, 1968, and expended by December 31, 1970, accounts for the increases in net worth over the years at issue. Since respondent allowed petitioners no cash on hand at the beginning of 1968, 1969, or 1970, petitioners contend his net worth method is erroneous. Based upon the entire record, we find no merit in petitioners' $300,000 secret cash hoard argument; however, we find that petitioners did have $20,000 cash on hand at the beginning of each of the years at issue.
As stated, the only item of respondent's net worth computation that petitioners specifically attack is zero cash on hand at the beginning of each of the years at issue. Petitioners offered only *73 contradicting and often vague testimonial evidence at trial to establish a secret cash hoard of approximately $300,000 on hand at January 1, 1968, which was spent during the next three years thereby producing the net worth increases. L. D. Perry testified that in 1956 when he liquidated Garfield Auto Sales, he had an $80,000 inventory of used cars and $100,000 in open accounts. Thomas Plummer, a parttime Garfield Auto Sales employee, testified that he collected $70,000 to $80,000 of the open accounts. L. D. Perry testified his mother collected an additional $8,000 to $15,000. He further testified that with the other cash already on hand, this gave him about $275,000 in cash which was placed in a sealed piece of sewer pipe which he stored above the furnace in his residence. In addition to a secret cash hoard of $275,000 in the sewer pipe, L. D. Perry testified he always kept an additional $20,000 to $35,000 in cash hidden in his residence. In 1962, petitioners moved to a new residence. L. D. Perry testified that the cash in the sewer pipe had grown to $300,000 through profitable business operations. He testified he buried this sewer pipe in the back yard of his new residence. *74 In this residence, L. D. Perry stated he kept his additional $20,000 to $35,000 in a second sewer pipe which was placed in the basement around the bathroom sewer pipes. He stated he kept the money hidden in sewer pipes to conceal the existence of the money from his wife.He testified that had marital problems and he was afraid of losing the money in a divorce. Also he did not like or trust banks. Petitioners called several witnesses to attempt to corroborate the existence of the cash hoard. George Perry, petitioners' son, testified that his father told him of the existence of a cash hoard in 1962 when he was 18 years old.His father did not tell him of the location or the amount of the hoard. L. D. Perry only told his son that upon his death to dig up the back yard. George Perry also stated that his father and mother had a bad marriage. David J. Hockett, a social friend, testified that L. D. Perry dealt in cash often and that he was personally present in 1970 when L. D. Perry paid cash for a $25,104 boat. George Perry testified that in 1970, his father brought him a sewer pipe containing $45,000 in cash to be used as a loan. He further testified that when his parents were *75 separated, he went to their home to obtain a sewer pipe for his father. He and his brother counted $90,000 in that pipe which was later given to his father. Finally, Charles Thatcher, petitioners' nephew, testified that in 1973 he discovered a piece of sewer pipe while excavating for a patio for petitioners' home. He gave the sewer pipe to his aunt, Mary Jean Perry, who accepted it without disclosing its contents. Despite L. D. Perry's attempts to corroborate his testimony, we find it unpersuasive. Moreover, since L. D. Perry is the only person to have regular contact with the alleged cash hoard, his testimony is vital; and since we find his testimony, considered in light of all testimonial evidence, as unpersuasive, we find no merit in the existence of a $300,000 cash hoard. L. D. Perry presented several inconsistencies in his own testimony. He first testified that until his father died in 1974 or 1975, the only person he over told about the existence of the cash hoard was his father. He later testified that he then told his son, George Perry, about the existence of the cash hoard. But George Perry later testified his father told him of the existence of the hoard in 1962. *76 Moreover, L. D. Perry testified that his wife never knew of the existence of the cash hoard. He later reversed his testimony to reflect that his wife did know of the cash hoard in the last few years of their marriage. He further testified that at the time of his divorce in 1975 he had a $90,000 cash hoard that was intentionally not revealed in his financial statement filed with the Divorce Court. He stated he intentionally failed to disclose this amount to keep it from his wife. We find it difficult to believe there was a cash hoard of $90,000 at the time of his divorce, even as also testified to by his son George Perry. If the hoard existed, why did his wife not make demands upon the funds since L. D. Perry's last testimony reflected that she was aware of the hoard. If his wife did not know of the existence of the funds, then L. D. Perry's testimony is inconsistent and unbelievable. The bottom line is that L. D. Perry asks us to believe that in 1975 he in fact had $90,000 that was unknown to his wife and the existence of which was intentionally hidden from a court of law in a divorce proceeding. We cannot and do not place any reliance on this testimony. Moreover, we were *77 unimpressed with L. D. Perry's testimony regarding deposits and withdrawals from his sewer pipe cash hoard. He kept no records of amounts allegedly placed in or removed from his two sewer pipes and yet he recalls he had $300,000 in the buried pipe and $20,000 to $35,000 in his other pipe. Unfortunately, L. D. Perry's testimony was vague on how many times he even removed the buried pipe from the ground from 1962 through the years at issue. He could only testify that when his money in the bank ran out, he obtained money from his sewer pipes. He finally alleges that through this process he reduced the cash hoard to zero by the end of 1970. He asks us to believe too much. In short, he can recall very few transactions with his cash hoard but he always seemed to know how much money the sewer pipes contained when it was to his advantage to do so. Even when he was able to recall a specific cash hoard transaction, this record did not support him. For example, he testified he bought a farm in 1968 for $75,000 and that the purchase price came from the buried pipe. Later, he acknowledged part of the purchase money came from his bank accounts. The record indicates, however, that L. D. Perry *78 had sufficient bank funds to pay for the farm. As noted, he earlier testified that he only withdrew funds from his cash hoard when his bank accounts weren't sufficient. David Hockett, a friend, testified that L. D. Perry paid $25,104 cash for a boat in 1970 in attempting to establish the fact that L. D. Perry dealt in cash. The record clearly establishes, however, that most of L. D. Perry's personal and business transactions were not accounted for in cash but by bank account transactions. In addition, L. D. Perry had sold another houseboat for $19,257 cash just a few months prior to purchasing the new boat. The cash from this sale and his bank accounts are the likely source of the new boat purchase price. Finally, L. D. Perry made statements inconsistent with his testimony as to the existence of a cash hoard on a loan application and during the audit investigation of this case. In 1965, L. D. Perry asserted on a loan application that he had only $9,000 cash on hand. The two examining agents testified at trial that they asked L. D. Perry in an audit conference at his attorney's office, after L. D. Perry was informed that he was being investigated for fraud, how much cash on *79 hand he had. They testified he answered $30,000 to $50,000 in each of the years at issue. At trial, L. D. Perry for the first time asserted a $300,000 cash hoard. Suffice it to say, we believe the agents' testimony. They were credible witnesses with a great deal of experience and training which directed them to seek out and discover the existence and amount of a cash hoard in a net worth case. Finally, we place no reliance on L. D. Perry's testimony regarding a cash source from the 1956 liquidation of his car sales business. Even if such cash were produced in 1956, petitioners' spending habits in current years indicate the cash could be exhausted in 13 years. More important, L. D. Perry's testimony is the exclusive evidence establishing any remaining amount on January 1, 1968, and we have already found his testimony unreliable. At the same time, there is a perfectly reasonable explanation of the increase in petitioners' net worth -- they represent unreported income from L. D. Perry's business interests operated during each of the years in issue. Our Findings of Fact clearly detail the gross income of L. D. Perry's business interests. Although we recognize that those businesses *80 also had substantial operating expenses, the large gross income figures represent the opportunity for L. D. Perry to siphon off funds. Moreover, at least one transaction leads us to believe that he was not concerned about extracting unreported cash from his business interests. In 1967, Smart & Perry, Inc., leased its business premises from Mark-Lee, Inc., for $3,000 a month. L. D. Perry owned at least 50 percent of each corporation. In late 1967, he caused the rent to be increased to $4,000 a month which Smart & Perry, Inc., deducted as rent. Mark-Lee, Inc., however, continued to report only $3,000 and L. D. Perry received $1,000 a month cash -- tax-free. Under these facts, we have no alternative but to conclude that there was not a $300,000 cash hoard and that petitioners had significant amounts of unreported income.
There remains the question, however, of whether respondent's use of zero cash on hand in each of the years is accurate. Having the benefit of the testimony of all the witnesses, we find petitioners had $20,000 cash on hand at the beginning of each of the years at issue. One of the examining agents testified that an analysis of petitioners' 1961 to 1967 tax returns *81 supported $20,000 cash on hand on January 1, 1968. L. D. Perry has consistently maintained in the audit investigation that he had at least $30,000 cash on hand. Accordingly, considering all the testimony, we find petitioners had $20,000 cash on hand on January 1, 1968, 1969, and 1970, which, of course, will require revised net worth calculations. In all other respects, we sustain respondent's net worth calculation. Petitioners make a final legal argument which we must reject. They argue that if respondent's zero cash on hand analysis is rejected that his entire net worth computation must fail. We recognize that respondent must establish an opening net worth with reasonable certainty as a starting point from which to calculate future increases in a taxpayer's assets. Holland v. United States,348 U.S. 121 (1954). But this does not require absolute certainty in ascertaining opening net worth. In Baumgardner v. Commissioner,251 F. 2d 311 (9th Cir. 1957), affg. a Memorandum Opinion of this Court, the Court of Appeals sustained our finding in a net worth case that the taxpayer had $5,000 in cash at the beginning of the period, not $14,000 to *82 $16,000 as contended by the taxpayer, not $100 as contended by respondent. See also Potson v. Commissioner,22 T.C. 912 (1954), affd. sub nom. Bodoglau v. Commissioner,230 F. 2d 336 (7th Cir. 1956), United States v. Johnson,319 U.S. 503 (1943). Thus, petitioners' showing of a small amount of cash on hand, as of the date respondent assumed no cash, does not render the determination invalid or nullify entirely the deficiencies as determined. We have considered petitioners' other arguments and find them unpersuasive. Issue 2. Fraud
The next issue we must decide is whether any part of the underpayment of taxes for each of the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b). Respondent bears the burden of establishing fraud, and he must prove it by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. To establish fraud, respondent must show that the taxpayer intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), *83 cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Since fraud can seldom be established by direct proof of intention, the taxpayer's entire course of conduct can often be relied on to establish circumstantially such fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. Based on the entire record, the evidence overwhelmingly establishes that L. D. Perry fraudulently underpaid his taxes during each of the years in issue. He arranged for the preparation of the tax returns, and those returns understated the petitioners' income by nearly $108,279.54 in 1968, $86,363.72 in 1969, $70,614.35 in 1970. Such a consistent pattern of underreporting *84 substantial amounts of income over a period of several years, standing alone, is persuasive evidence of fraud. Holland v. United States, 139 (1954); Adler v. Commissioner,422 F. 2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970); Agnellino v. Commissioner,302 F. 2d 797, 801 (3d Cir. 1962), affg. on this issue a Memorandum Opinion of this Court. We recognize that such principle should be applied with caution where the finding of unreported income is based on the taxpayer's failure to meet his burden of proof in some respect. See Otsuki v. Commissioner,supra at 106; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971). However, our conclusion was not based on the petitioners' failure of proof. Based on all the evidence, we affirmatively found that no significant cash hoard existed in 1968 and that the petitioners' unreported income was derived from L. D. Perry's business interests. Yet, we need not rely solely *85 on the petitioners' failure to report substantial income, because there are other significant indicia of fraud.
As noted earlier, the record discloses a specific instance in 1967, 1968 and 1969 where L. D. Perry diverted the corporate income of Mark-Lee, Inc., for his own personal use. This was achieved by increasing the rent payment from Smart & Perry, Inc., from $3,000 to $4,000 a month while having Mark-Lee, Inc., report the same $3,000. L. D. Perry pocketed $1,000 a month in cash. The records of Mark-Lee, Inc., continued to reflect $3,000 monthly rental income. L. D. Perry's attempt to conceal the source of income and his manner of handling the transaction so as to avoid usual records is a clear indication of fraud. Spies v. United States,317 U.S. 492 (1943). In addition, the manner in which L. D. Perry kept his books and records also supports a finding of fraud. We have found that part of the understatements were possibly caused by the diversion of corporate funds in a situation where no records were maintained and currency was used.Also, the large unexplained understatements of taxable income in the years at issue indicate petitioners' books and records *86 were not accurate. Finally, L. D. Perry's evasive conduct during the course of audit and his willingness to say whatever financially benefited him is further evidence of fraud. L. D. Perry was interviewed in his attorney's office after he had been informed of a tax fraud investigation. He maintained he had a cash hoard of $30,000 to $50,000.Later, after he was informed of the large understatements in his taxable income, he increased his cash hoard to $300,000. Moreover, at trial, L. D. Perry was able to recall with great detail that he had two sewer pipe pieces and the approximate amounts of cash in each one; but his trial explanations of the use of the hoard were not supported by the record. In the specific instance of the 1968 farm purchase, his bank records indicated an ample supply of funds to pay the purchase price. The farm was, in fact, paid for with bank account funds. L. D. Perry earlier testified, however, that he only used sewer pipe funds when bank accounts were insufficient. Thus, his testimony that he used sewer pipe funds for the farm purchase is not to be believed. He also stated that he had no cash hoard in a loan application in 1965.In 1975, his divorce *87 proceeding financial statement disclosed no significant cash hoard. Yet at trial, he testified he specifically and intentionally lied to the divorce court to protect his assets from his wife -- a position, we are aware, he must maintain in this Court to prevail. There are so many inconsistencies and derogatory admissions in L. D. Perry's testimony that it is difficult to know what to believe, but it is clear that such statements were made with a purpose of concealing his unreported income. Accordingly, we find that part of the underpayment for each of the years at issue was due to fraud on the part of petitioner. Respondent also argues that part of each underpayment of tax was due to the fraud of Mary Jean Perry. In support of his contention, respondent asserts that Mary Jean Perry was aware that the Federal income tax returns which she signed for the years 1968, 1969, and 1970, were false and fraudulent when the amounts reported are contrasted with the style of living which she and her husband were experiencing during the years in question. Under section 6653(b), however, Mary Jean Perry is not liable for the fraud penalty unless it is shown that part of the underpayment for *88 each of the years at issue was due to fraud on her part. Fraud may never be imputed or presumed, but must be affirmatively proved. Stone v. Commissioner,supra at 224. On the basis of the record before us, respondent has not proved by clear and convincing evidence that any part of the underpayment was due to fraud on her part. The record discloses that Mary Jean Perry had nothing to do with the family finances other than signing necessary documents. L. D. Perry testified that he accumulated and prepared the necessary documents to take to the tax preparation person charged with completing the returns. The record before us indicates that L. D. Perry assumed the full financial responsibility for the family and nothing indicates that Mary Jean Perry realized how much income was received by the family. Indeed, L. D. Perry testified he attempted to hide assets from Mary Jean Perry. This indicates he also disguised various sources of income. Admittedly, Mary Jean Perry knew her husband was engaged in a number of businesses, but nothing indicates she knew how successful they were since they constantly applied for loans. Finally, we simply see no affirmative *89 evidence that she had any way of knowing that the taxable income reported on their returns for the years in issue did not accurately reflect their income. In conclusion, we hold that both petitioners are liable for the deficiencies in income tax for each of the years 1968, 1969, and 1970; that L. D. Perry is liable for the fraud penalty for each of such years; and that Mary Jean Perry is not liable for such penalty. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩