Anthony AGNELLINO and Florence
Agnellino, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 13655.

United States Court of Appeals
Third Circuit.

Argued Dec. 18, 1961.

Decided May 9, 1962.

---

Benjamin Weiner, New Brunswick, N. J. (Mayo & Weiner, New Brunswick, N. J., on the brief), for petitioners.

Robert L. Waters, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Robert N. Anderson, Attys., Department of Justice, Washington, D. C., on the brief), for respondent.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The Tax Court has determined that there are deficiencies aggregating $54,-532.45 in the joint income tax returns of petitioners, Anthony Agnellino and his wife Florence, for the five years from 1953 through 1957. To these deficiency assessments 50 per cent fraud penalties were added. On this appeal the taxpayers contest both the deficiency assessments and the fraud penalties.

During the taxable years Anthony Agnellino operated a motel and a drive-in restaurant in Eatontown, New Jersey. Starting in 1952 with 13 motel units, he increased the size of the motel to 27 units during the summer of 1953. In 1957, 6 more units were added. In 1958 Agnellino discontinued his own operation of the restaurant and leased it for a rental agreed not to be less than $5000. In 1959 he sold the entire operation for $175,000.

In calculating or reconstructing the income of this business for the taxable years the Tax Court used methods which the taxpayers say were improper. Unfortunately, this is a case in which it has not been possible to use the taxpayers' own records and books of account or their accounting methods as guides to official inquiry. The taxpayers have ex-

plained that their motel records for 1953, 1954 and 1955 were destroyed in a fire. Their accountant's "work papers", which they offered as a substitute, were admittedly made without any examination of the now missing records by the accountant. Motel records for 1956 and 1957 were incomplete. Moreover, they disclosed numerous mathematical inaccuracies. No record of restaurant receipts existed for 1953, 1954, 1955 and most of 1957, and records for 1956 and the remainder of 1957 were incomplete. Thus, to determine how much the business had earned during the taxable years, it was proper and indeed necessary to devise some substitute method for reconstructing income. True, Section 446(b) of the 1954 Internal Revenue Code as derived from Section 41 of the 1939 Code, 26 U. S.C. § 446(b) and § 41, requires that such substitute methods shall "in the opinion of the Secretary or his delegate * * * clearly reflect income." But this does not mean that the determination must or can be precise as is a computation based upon accurate detailed records maintained in the regular course of business. It is enough that in logic and in the light of normal business experience the method used provides a fair and rational measure of income. United States v. Johnson, 1943, 319 U.S. 503, 517–518, 63 S.Ct. 1233, 87 L.Ed. 1546; Shahadi v. Commissioner, 3d Cir., 266 F.2d 495, cert. denied, 1959, 361 U.S. 874, 80 S.Ct. 137, 4 L.Ed.2d 113; Bishoff v. Commissioner, 3d Cir. 1928, 27 F.2d 91.

■ Once the method itself is found acceptable the Tax Court's factual findings in the course of applying that method must be upheld unless they are found to be clearly erroneous. See Valetti v. Commissioner, 3d Cir. 1958, 260 F.2d 185; Conway v. United States, 1st Cir. 1960, 278 F.2d 710.

■ The parties have called the method used to determine motel income in this case the "sheet count" method because it was based upon the number of fresh sheets rented by the motel during each taxable year. Allowance was made for sheets used by persons other than paying

guests. A special computation was made for long term guests. Otherwise, each two sheets were taken to represent one guest occupying a room for one day at a rate of $7.10, which the parties stipulated as the average rate for 1954 and all subsequent years. If there was any obvious error in this method, it lay in the failure to take into account those cases where two guests may have used but a single pair of sheets. But this discrepancy was obviously favorable to the taxpayers. We are satisfied that the sheet count method, as employed here, was a legally permissible way of determining minimum gross receipts of the motel. Compare Cohen v. Commissioner, 9th Cir. 1959, 266 F.2d 5.

A large part of the detailed fact finding involved in applying the sheet count method to the computation of motel income was based upon stipulations. The only substantial challenge to this detailed computation which requires discussion concerns the year 1953. The Tax Court's findings as to the number of sheets used in 1954 and subsequent years and its finding that $7.10 was the average daily room rate during those years were based on stipulations or testimony or both. But no evidence of the number of sheets used or rates charged in 1953 was introduced and no figures were stipulated for that year. The Tax Court stated that it was unable to determine how the agents of the Internal Revenue Service who handled this case arrived at an amount representing 1953 motel receipts.

■ In these circumstances, the Tax Court drew the inference that the average number of sheets used annually after 1953 was also a fair and reasonable approximation of the number of sheets used during 1953, provided that appropriate deductions should be made, as they were, for the smaller number of rooms in use during the first half of 1953. This inference necessarily involved the assumption that the rate of occupancy in 1953 was as high as the average occupancy rate thereafter. The record shows that, in conversations with agents who tried to reconstruct his income, Agnellino referred generally to the pattern of motel oc-

cupancy, stating that his motel was full during the busy season with occupancy falling off to 60 or 70 per cent during the off season. He suggested no significant variation in this pattern from year to year or in any particular year. Moreover, Agnellino's action in doubling the capacity of the motel in 1953 and again increasing its capacity in 1957 is some indication that this entire period was a time of high occupancy. It was, therefore, not unreasonable for the Tax Court to use the average sheet count for 1954 and subsequent years as fairly reflecting 1953 experience as well.

Similar considerations justified the use of the average room rate of $7.10, stipulated for 1954 and subsequent years, as a valid approximation for 1953. Here again, Agnellino discussed with the agents the rates charged for various rooms without specifying years, indicating a rather stable rate structure.

■ The basic datum in reconstructing restaurant gross receipts was the cost of food purchased for the establishment. From this were subtracted amounts agreed fairly to represent the cost of food consumed by the Agnellino family and the cost of food stolen. The cost of food consumed by employees was also deducted. The Tax Court then undertook to determine the percentage relation between the cost of food served to patrons and the gross restaurant receipts in such an enterprise as this. To this end the Tax Court started with the years 1954 and 1955 and accepted as correct the restaurant receipts reported in taxpayers' tax returns for those years, the only returns in which restaurant and motel receipts were segregated. The total restaurant receipts thus reported for 1954 represented a gross profit of 54 per cent on the cost of the food sold. For 1955, the gross profit was 54.7 per cent. The Tax Court then stated that "accepting these percentages as accurate, we have found that the gross profit during the [other] taxable years ranged from 58 per cent to 50 per cent, depending largely upon the volume of sales made in the restaurant". Searching the record, we have been unable to find any evidentiary basis for these variations in estimated gross profit. To the contrary, an examination of the tax returns for 1954 and 1955 shows that the cost of food sold was almost 20 per cent higher in one year than in the other. Yet, the gross profit on food sold varied less than one per cent. No reason appears for concluding that the variation was substantially greater in 1953, 1956 and 1957.

The determination of gross profit on food sales is made more unsatisfactory by apparent differences in the bases used by different witnesses in estimating such profit. Thus, the operator to whom Agnellino leased the restaurant testified that he raised prices, introduced profitable new items, fired employees suspected of theft and still made a gross profit of only 48 per cent on his food costs during his first year of operation. It is not clear what inference can be drawn from this as to Agnellino's profit, particularly since it is uncertain whether consumption by family and employees and pilferage were eliminated in this estimation as they were in the Tax Court's computation of the taxpayers' profit on food. Similar uncertainty clouds the significance of the testimony of the government's own expert witness that in a badly run restaurant gross profits on food might be as low as 45 per cent. The evidence strongly suggests that this restaurant was not a skillful operation.

The whole record considered, we think the findings as to the percentages of gross food profits in 1953 and 1957 were speculative and without justification in the record. Therefore, the Tax Court was clearly wrong in its determination of restaurant income for those years. No such fault can be found in the 1956 determination since it did not differ significantly from taxpayers' own reports for 1954 and 1955.

As a separate point taxpayers urge that the Tax Court improperly relied upon the presumption of correctness of the Commissioner's initial determination of

deficiencies. However, it is clear that the Tax Court made its own independent findings of fact based upon evidence in the record and the stipulations of the parties. In this connection it is significant that while the Commissioner decided that taxpayers' deficiencies aggregated $173,000, the Tax Court found deficiencies of only $53,000. The taxpayers' contention is not well founded.

■ But even if the deficiency assessments were justified, the taxpayers strongly urge that the assessment of fraud penalties was erroneous. On this aspect of the case the question is whether the record justified a finding that in each of the taxable years some part of the underpayment of taxes was due to fraud. Section 6653 of the 1954 Internal Revenue Code and Section 293(b) of the 1939 Code, 26 U.S.C. § 6653 and § 293 (b).

■■ We recognize the heavy burden which the government bears when it undertakes to prove that a tax return has been made fraudulently. Valetti v. Commissioner, 3d Cir. 1958, 260 F.2d 185. Here, the Tax Court has relied upon several circumstances which in the aggregate have seemed to that court to provide clear and convincing evidence of fraudulent intent. Particularly striking was evidence of Agnellino's extraordinary banking procedures throughout the period in question. At the end of each day receipts of the motel and the restaurant were turned over to Agnellino personally. Though he had a bank account and paid many obligations by check he did not routinely deposit daily receipts. Rather, he drew checks on his account without regard to his current balance so that their presentation for payment very frequently resulted in overdrafts which he then covered with cash deposits. This happened so often that Agnellino himself estimated that he had to pay the bank $400 or $500 annually for penalties of 50 cents, and later $1.00, per overdraft. Despite this continuing costly experience Agnellino did not adopt the procedure of routine deposits of current receipts in his bank account. A fact finder could rea-sonably view this odd course of conduct as a substantial indication that the taxpayer was determined, even at considerable expense to himself, to prevent his bank account from disclosing any more of his income than was necessary. Compare Hooper v. United States, 10th Cir. 1954, 216 F.2d 684, 688; Gariepy v. United States, 6th Cir. 1951, 189 F.2d 459, 463.

■ There was other evidence of fraud. Agnellino admitted that from 1953 through 1957 he was paid some $650 annually to permit an entrepreneur to maintain a juke box and a cigarette vending machine in his place of business. Yet, he never made any report of income from these sources. This total failure to report income from particular sources combined with consistent failure to report a substantial part of the earnings of the motel and the restaurant may properly be considered as indicia of fraudulent intent. Cf. Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150; Schwartzkopf v. Commissioner, 3d Cir. 1957, 246 F.2d 731. Again, using the very incomplete records of individual registrations and motel charges which the taxpayers had preserved, the government produced three motel guests who testified that they had paid from two to three times as much for their accommodations as was stated in the motel registration record. See the discussion in Valetti v. Commissioner, supra, 260 F.2d at 189. It is true that this evidence did not cover the earlier years of the corporation, but these were years for which no registration records were available.

■ Without discussing the several other circumstances viewed by the Tax Court as indicia of fraud, we are satisfied that a reasonable fact finder could have found the evidence of fraud clear and convincing.

In sum, we find error in the Tax Court's decision only in that the deficiencies and penalties for 1953 and 1957 were based in part on erroneous determinations of restaurant receipts for those years. Accordingly, the decision of

the Tax Court will be vacated and the cause remanded for a new determination of 1953 and 1957 deficiencies and penalties and the entry of an appropriate new decision.