PAULINE GRASAVAGE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; EDWARD GRASAVAGE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grasavage v. Commissioner
Docket Nos. 9734-75, 9735-75.
United States Tax Court
T.C. Memo 1979-89; 1979 Tax Ct. Memo LEXIS 440; 38 T.C.M. (CCH) 358; T.C.M. (RIA) 79089; March 15, 1979, Filed *440 H and W operated an illegal gambling business but reported no income from such business in 1972. In addition, H operated a gasoline station in 1972 and 1973 but reported no income from such business during those years. Held, the amount of unreported illegal gambling income, which was earned equally by H and W, determined. Held, further, H had unreported income from the operation of the gasoline station in 1972 and 1973 in the amounts determined by the Commissioner. Held, further, H and W are liable for additions to tax under secs. 6651(a), 6653(a), and 6654, I.R.C. 1954. Joseph A. Lakowski, for the petitioner in docket No. 9734-75. Edward Grasavage, pro se in docket No. 9735-75.
Russell K. Stewart, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Additions to Tax
Sec. 6651(a)
Sec. 6653(a)
Sec. 6654 Petitioner
Year
Deficiency
I.R.C. 1954 [1]
I.R.C. 1954
I.R.C. 1954
Pauline
1972
$65,122.83
$16,112.00
$3,223.00
$ 2,062.30
Grasavage
Edward
1972
70,895.25
17,724.00
3,545.00
2,268.65
Grasavage
1973
1,369.76
342.00
68.45
43.84
*442 The issues for decision are: (1) Whether the petitioners had unreported gambling income in 1972 and, if so, how much; (2) whether one of the petitioners had unreported business income from the operation of a gasoline station in 1972 and 1973 and, if so, how much; and (3) whether the petitioners are liable for the additions to tax under sections 6651(a), 6653(a), and 6654. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Edward and Pauline Grasavage, husband and wife, resided at 293 South Main Street, Pittston, Pa., in 1972 and at the time they filed their petitions in this case. During 1972 and 1973, Mr. Grasavage operated a gasoline station located at 294 South Main Street, Pittston, Pa.
During early 1972, agents of the Federal Bureau of Investigation had received a "tip" by certain undisclosed informants that the petitioners were engaging in illegal gambling activities. Accordingly, sometime prior to April 26, 1972, a team of FBI agents set up an observation post about 1-1/2 to *443 2 blocks from the gas station for surveillance purposes to determine if the petitioners were engaging in such activities. From their observation post, they viewed the gas station through binoculars and observed that each day, during a 3-to 4-hour period, an unusual number of people entered the gas station, handed something to Mr. Grasavage, and then left the gas station without purchasing gas. However, they were too far from the gas station to determine what exchanged hands. Based on the informants' tips and the FBI agents' observations of suspicious activity at the gas station, a sworn application was filed with the United States District Court for the Middle District of Pennsylvania on April 26, 1972, requesting an order permitting the FBI to intercept wire communications of the petitioners involving the conduct of an illegal gambling business. The application was granted, and an order was issued on that date permitting the FBI to intercept wire communications made to or from the petitioners' home phone. Commencing at approximately 1:00 p.m. on April 27, 1972, and thereafter at approximately 8:00 a.m. each day and continuing until approximately 8:00 p.m. each day through *444 May 2, 1972, communications made to and from the petitioners' home phone were intercepted by the FBI. During such conversations, the petitioners accepted numerous wagers, discussed winnings, losses, payoffs, and collections, and squabbled over whether a particular wager had been made, whether payment should be made, whether a particular person should be allowed to place a wager, etc. A majority of the calls were to or from Mrs. Grasavage. Substantially all of the conversations involving gambling activity during the periods monitored were recorded by the FBI. On May 5, 1972, Mr. Grasavage informed his daughter sometime during the morning that "he was expecting company" from the FBI or the State police. Later the same day, FBI agents armed with search warrants simultaneously raided the gas station and the petitioners' residence and searched both premises. At the gas station, they seized a few betting slips, $359 in cash in filing cabinets and cigar boxes, and numerous racing sheets and magazines.At the petitioners' residence, the search uncovered in excess of $9,000 in cash and a green notebook containing an alphabetized listing, by first name, of the petitioners' gambling customers. *445 Each page in the notebook was devoted to one customer whose name appeared at the top of such page. Underneath the name was a series of entries which appeared to be an incomplete running total of the person's gambling activities with the petitioners. The entries had been made by both petitioners. On October 11, 1972, the petitioners and others were indicated by a Federal grand jury for conspiring to conduct an illegal gambling business and for engaging in an illegal gambling business which involved 5 or more persons and which had gross revenues in excess of $2,000 on one or more single days, in violation of 18 U.S.C. sections 2, 371, and 1955. On August 30, 1974, judgments and orders of convictions were entered against both petitioners on both counts in the indictments. In July 1972, a revenue agent of the Internal Revenue Service was assigned to the petitioners' case for the purpose of making a termination assessment under section 6851. Subsequently, such revenue agent conducted an audit of the petitioners for 1972 and 1973. His job was made very difficult because neither Mr. nor Mrs. Grasavage filed tax returns for 1972 or 1973 (although Mr. Grasavage *446 did submit an unsigned form (unsigned form) for 1972 to the revenue agent on December 4, 1974), and because neither petitioner provided him with sufficient information to prepare returns.However, based on a special agent's analysis of transcripts of the intercepted conversations (transcripts), on another analysis prepared by other agents indicating wagers exceeded payoffs by 37 percent, and on Shades Ridge Holding Co. v. Commissioner,T.C. Memo. 1964-273, affd. per curiam sub nom. Fiorella v. Commissioner,361 F. 2d 326 (5th Cir. 1966), in which a profit margin of 30 percent was applied for computing gambling income, the revenue agent determined the gambling income of the petitioners as follows: Total average daily book $ 3,535.40
Racing days in year (1-1-72 to 5-5-72)
108
Total bookings for above period
$381,823.20
Estimated profit percentage
30%
$114,546.96
In the notice of deficiency, the Commissioner determined that each of the petitioners received gambling income in the amount of $114,546.90. In addition, the revenue agent determined Mr. Grasavage had additional income in 1972 and 1973 as follows: Income Source
1972
1973
Business income
$5,996.31
$5,534.55
Dividend income
501.00
501.00
Interest income
808.00
808.00
Race track winnings
401.00
Racing school
540.00
Total
$8,246.31
$6,843.55
*447 With the exception of the business income, such determinations were based on Mr. Grasavage's unsigned form.
To compute Mr. Grasavage's business income from the gasoline station, the revenue agent contacted Mr. Grasavage's supplier of oil and gas products and requested and received copies of Mr.,grasavage's invoices for the years in issue. From such invoices, he determined the number of gallons of regular and high-test gasoline purchased by Mr. Grasavage in 1972 and 1973; he computed the gross receipts from the gas station by assuming that regular gasoline sold at a markup of 5 cents per gallon and that high-test sold at a markup of 7 cents per gallon. The gas station was a two-bay station, and the invoices indicated Mr. Grasavage purchased substantial quantities of oil and related products. Mr. Grasavage also sold newspapers, milk, soft drinks, and candy. However, the revenue agent did not include in Mr. Grasavage's gross receipts any amounts received from repairs, sales of oil and related products, newspapers, milk, soft drinks, and candy. In addition, he computed Mr. Grasavage's cost of goods sold based on such invoices; he computed Mr. Grasavage's other deductions for 1972 *448 and 1973 based on the business expense claimed by him on schedule C of the unsigned form for 1972. The revenue agent's computation of Mr. Grasavage's business income for 1972 and 1973 is summarized below: 1972
1973
Gross business receipts
$93,306.92
$95,295.60
Cost of goods sold
Gasoline
$77,916.31
$80,650.00
Other purchases
1,283.65
1,000.40
Cost of sales
79,199.96
81,650.40
Gross profit on
sales
$14,106.96
13,645.20
Deductions
8,110.65
8,110.65
Net profit
$ 5,996.31
$ 5,534.55
Accordingly, Mr. Grasavage's taxable income was increased in the deficiency notice by $5,996.31 for 1972 and $5,534.55 for 1973. During 1976, after the deficiency notices had been issued and the petitions in the case had been filed, a special agent of the IRS who was an expert in gambling cases was assigned to analyze the transcripts of the intercepted wire communications. After analyzing the transcripts, he computed the minimum wagering activity reflected therein as follows: Date
Wager
4-27-72 $ 896.00
4-28-72
1,401.50
4-29-72
1,887.50
4-30-72 (Sunday)
5-1-72
1,320.00
5-2-72
1,278.00
Total
$6,783.00
*449 Since the FBI agents did not begin monitoring and recording the petitioners' telephone conversations until approximately 1:00 p.m. on April 27, 1972, the special agent determined that the monitored gambling activity, exclusive of Sunday, was for a period of 4-1/2 days.His conclusions reflected only the "daily minimum betting totals" because calls were not recorded when the monitoring agents changed tapes on the recording device, because ambiguous bets (i.e., 50 could be 50 cents or $50) were resolved most favorably to the petitioners, and because walk-in bets at the gas statin were not reflected in such totals. Dividing $6,783 by 4-1/2 days, the average daily minimum wager was computed, and such amount was in turn multiplied by 108 (betting days from January 1, 1972 through May 5, 1972, exclusive of Sundays) and by 30 percent (net profit percentage) to yield a net income from such illegal gambling business of $48,838. At the trial and in his brief, the Commissioner adopted such figure as the petitioners' net income from gambling and determined that it should be divided equally between the petitioners. OPINION The first issue for decision is whether the petitioners had unreported *450 income from gambling in 1972, and if so, how much. Using the best information available, the revenue agent determined in the deficiency notices that each petitioner had net gambling income of $114,546.90 in 1972. However, at the trial in this case, the Commissioner presented the testimony of an expert witness, and based on his testimony, determined the petitioners' net gambling income was $48,838.00. Now, he takes the position that each petitioner is responsible for reporting one-half of such gambling income. Section 446 states that a taxpayer's taxable income shall be computed using the method of accounting regularly used by such taxpayer. Section 6001 requires taxpayers to keep sufficient records to establish the amount of gross income, credits, deductions, or other matters necessary to the computation of tax liability. Sec. 1.6001-1 (a), Income Tax Regs. If the taxpayer fails to keep adequate records, or if the taxpayer's method of accounting does not clearly reflect his income, then the Commissioner is authorized to reconstruct the taxpayer's income using a method which, in the Commissioner's opinion, does clearly reflect income. Sec. 446(b). Since the petitioners kept *451 no comprehensible books and records of their gambling activities, "it was proper and indeed necessary to devise some substitute method for reconstructing income." See Agnellino v. Commissioner,302 F. 2d 797, 799 (3d Cir. 1962), affg. on this issue a Memorandum Opinion of this Court. Because of the problems involved in determining income from gambling and other illegal businesses, the courts have permitted the Commissioner to reconstruct such income by computing the average daily gross gambling revenues received in a 2- to 4-day sampling of gambling activity, and by projecting such average daily gross gambling income over the entire period of gambling activity. See, e.g., Gerardo v. Commissioner,552 F. 2d 549 (3d Cir. 1977), affg. on this issue a Memorandum Opinion of this Court; Mitchell v. Commissioner,416 F. 2d 101 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 396 U.S. 1060 (1970); Fiorella v. Commissioner,361 F. 2d 326 (5th Cir. 1966), affg. per curiam a Memorandum Opinion of this Court; Gordon v. Commissioner,63 T.C. 51, modified 63 T.C. 501 (1975), *452 affd. per curiam 572 F. 2d 193 (9th Cir. 1977), cert. denied 435 U.S. 924 (1978); Hamilton v. United States,309 F. Supp. 468 (S.D. N.Y. 1969), affd. 429 F. 2d 422 (2d Cir. 1970), cert. denied 401 U.S. 913 (1971). As recently stated by the Court of Appeals for the Third Circuit: Where unreported income from gambling is at issue, the projection of average daily gross receipts over a period of time in order to calculate gross income is an acceptable method of reconstruction. * * * [Gerardo v. Commissioner,552 F. 2d at 552 n. 6.] However, where the taxpayers challenge the bases for such reconstruction of income, some courts have required some showing that the period used to compute the average daily gross receipts is reflective of the gambling activity for the entire period under consideration, and that the taxpayers were in fact engaged in gambling activity during the entire period. See Carson v. United States,560 F. 2d 693 (5th Cir. 1977); Gerardo v. Commissioner,supra;Pizzarello v. United States,408 F. 2d 579, 583 (2d Cir. 1969), *453 cert. denied 396 U.S. 986 (1969). Here, the petitioners do not argue that the gross wagers evidenced in the transcripts are not reflective of the wagers made from January 1, 1972 to May 5, 1972, or that they did not engage in such activity during such period. In fact, the green book seized during the raid at the petitioners' residence contains entries for the entire period, and in their effort (described later) to explain the wagers, they implicitly admit that they accepted wagers over the entire period. However, the petitioners disagree with the Commissioner over how such wagers should be characterized. They contend that Mr. Grasavage was operating a racing school for people who were attempting to improve their betting skills. According to the petitioners, all wagers were hypothetical, and no money passed hands as a result of such wagers. In addition, they argue that the amount of the deficiencies is unreasonably excessive because the gross wagers were too large and because the 30-percent profit percentage was arbitrary. They also argue that the allocation of gambling income between the petitioners equally is unreasonable because both petitioners testified that *454 Mrs. Grasavage was merely an employee. Based on such arguments, they conclude that the deficiency determinations are arbitrary and capricious and therefore not entitled to any presumption that they are correct. See Helvering v. Taylor,293 U.S. 507 (1935). They ask this Court to conclude, based on the evidence presented, that the petitioners had no unreported income from gambling. As a general proposition, it is firmly established that the Commissioner's deficiency determination is presumptively correct and that the petitioner bears the burden of proving such determination to be erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). However, if the petitioner establishes that the deficiency determination is arbitrary or capricious, then the presumption of correctness is overcome, and this Court must determine if the taxpayer has any tax liability based upon all the evidence. Helvering v. Taylor,supra.In our judgment, the petitioners have not established the arbitrariness of the Commissioner's deficiency determinations; to the contrary, the evidence convincingly establishes *455 the fact that the petitioners were engaged in an illegal gambling business from which they derived considerable gambling income. The transcripts clearly and unequivocally demonstrate that the petitioners were engaged in an illegal gambling business.Such transcripts contain constant and unmistakable reference to odds, payoffs, winnings, and losses, in addition to numerous squabbles over who bet, who won, who lost, how much was bet, and how much would be collected, and when. Such conversations do not appear to be concerned with merely hypothetical wagering. The gambling paraphernalia and the large sum of money seized during the raids also support our conclusion that the petitioners were engaged in the operation of an illegal gambling business. We also wonder what would have been found during the raids had Mr. Grasavage not been warned. However, most importantly, both petitioners were convicted of gambling between April 27, 1972 and May 2, 1972. Notwithstanding that the FBI agents were unable to observe money changing hands, we think the evidence establishes beyond any reasonable doubt that the petitioners were engaged in an illegal gambling business. In addition, in our opinion, *456 the petitioners' allegations that they operated a racing school which accepted hypothetical wagers is pure hokum. The petitioners did not make such contention at their criminal trial. None of their so-called students corroborated the petitioners' story, nor were they even called as witnesses by the petitioners. When asked during the trial in this case if they could identify any of their students, the petitioners said they only knew their first names and could not otherwise identify them. In view of the nature and the tone of the recorded telephone conversations, it is clear that the petitioners knew a good deal more about their "students" than they were willing to reveal at trial. In addition, not once in the transcripts is there even a fleeting reference to a racing school or a hypothetical wager. The articles and advertisements introduced by the petitioners are not persuasive; they have little or nothing to do with a racing school, and they certainly have nothing to do with the petitioners' operation. Furthermore, we conclude that the deficiencies are not unreasonably excessive. The revenue agent estimated the gross wagers using the best information available to him. He *457 estimated the petitioners' profit at 30 percent because a partial analysis of the petitioners' betting transactions indicated wagers exceeded payoffs by 37 percent, and because 30 percent was the profit percentage used in a prior Tax Court case.The agent then prepared deficiency notices in which he increased each of the petitioners' income by the net profit from gambling. Later, after an expert had reviewed the transcripts and recomputed the gross wagers, the Commissioner reduced the petitioners' gambling income to comport with such expert's analysis. Such expert also testified that in gambling businesses similar to the petitioners', net profits generally ranged between 20 and 40 percent of gross wagers. Such sequence of events gives the petitioners no bases for complaint. At each juncture, the Commissioner's action was reasonable under the circumstances. In addition, it must be kept in mind that it was the petitioners' failure to keep or produce records of their gambling activities which resulted in the Commissioner reconstructing their incomes. [2] As we stated in Harbin v. Commissioner,40 T.C. 373, 377 (1963): *458 It is recognized that the "burden to adopt a method that will clearly reflect the income is on the Government equally as well as on the taxpayer." This does not mean, however, that where a taxpayer has deliverately and willfully failed and refused to keep and maintain any books or records of his business transactions, the Commissioner, in making his determination of a deficiency, is required to compute the net income of the taxpayer with mathematical exactness. "Under such circumstances, approximation in the calculation of net income is justified." To hold otherwise would, as the Supreme Court stated in United States v. Johnson,319 U.S. 503, "be tantamount to holding that skilful concealment is an invincible barrier to proof." * * * [Citations omitted.] Moreover, the petitioners have not pointed us to one specific error in the analysis of the Commissioner's expert; they have not in any manner demonstrated that the revenue agent was incorrect in determining their net profit equaled 30 percent of gross wagers, and they have not come forward with any method of their own for establishing gross wagers and the "proper" profit percentage. In addition, the issuance *459 of alternative or inconsistent deficiency notices in this case does not make them arbitrary. It is firmly established that such notices are permissible in cases where it is not entirely clear which of two or more taxpayers is liable for the tax. Gerardo v. Commissioner, supra;Cannon v. Commissioner,533 F. 2d 959 (5th Cir. 1976), affg. a Memorandum Opinion of this Court, cert. denied 430 U.S. 907 (1977); L.C. Bohart Plumbing & Heating Co. v. Commissioner,64 T.C. 602, 615-616 (1975), and the cases cited therein. We also agree with the Commissioner that the gambling income should be divided equally between the petitioners. The Commissioner's determination, which is presumptively the Commissioner, nor did he come forward with any evidence of the markup he did use. In addition, Mr. Grasavage produced no original records of his gas station business. On this record, we must conclude that Mr. Grasavage had unreported business income in 1972 and 1973 in the amounts determined by the Commissioner. Finally, in their petitions, at the trial, and on brief, the petitioners did not contest any of the other adjustments, *460 nor did they contest the additions to tax under sections 6651(a), 6653(a), and 6654; and our own analysis of the record convinces us that the petitioners had no basis for doing so. Accordingly, we hold Mr. Grasavage had unreported dividend income, interest income, race track winnings, and racing school income in 1972 and 1973 in the amounts determined by the Commissioner in the deficiency notice. Furthermore, we conclude that both petitioners are liable for the additions to tax under sections 6651(a), 6653(a), and 6654, computed on the deficiencies determined by us. Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.↩
2. At the trial, the petitioners offered "records" of their gambling transactions which had not previously been made available to the Commissioner. The records consisted of incomprehensivle adding machine tapes with figures on them. Such tapes were of varying lengths and stapled together in what appeared to be random bunches. Several of these bunches were then rolled together to form five packets which, according to the petitioners, represented their wagering activity from April 27, 1972 to May 2, 1972. Mr. Grasavage stated the records had been prepared in 1972 simultaneously with the telephone calls. The Commissioner was surprised by such evidence, and therefore, a recess was granted until the following morning to give the Commissioner's expert an opportunity to analyze such "records." Such analysis revealed that the records corresponded to a certain extent with the transcripts, except that a whole series of records evidencing large losses was included in such records but not on the transcripts.Several of such losses were recorded on the back of 1977 oil and gas receipts. The next morning, the petitioners withdrew drew such exhibits, and then Mr. Grasavage testified that such records had been prepared in 1977. The Commissioner then offered the "records" in evidence to impeach Mr. Grasavage's earlier testimony. The petitioners never explained how such records showed their wagering activities during April 27, 1972 through May 2, 1972.↩