BERKELEY E. AND BARBARA A. GROVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BERKELEY E. GROVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grove v. Commissioner
Docket No. 12319-77, 12320-77.
United States Tax Court
T.C. Memo 1980-83; 1980 Tax Ct. Memo LEXIS 501; 39 T.C.M. (CCH) 1266; T.C.M. (RIA) 80083; March 20, 1980, Filed *501 Petitioner was the backer of a numbers operation. While the operation generated a large amount of income to petitioner, he deliberately failed to report any such income. Held: the amounts of petitioner's taxable income from gambling determined. Held further: petitioner liable for sec. 6653(a) addition to tax. Berkeley E. Grove, pro se. Carol K. Scott, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By letter dated September 28, 1977, respondent determined a deficiency in income taxes due from petitioners Berkeley E. and Barbara A. Grove for their taxable year ended December 31, 1973 in the amount of $236,658 plus an addition to tax under section 6653(a) in the amount of $11,832.90. By separate letter dated September 28, 1977 respondent determined a deficiency in income taxes due from petitioner Berkeley E. Grove for his taxable year ended December 31, 1974 in the amount of $27,004 plus an addition to tax under section 6653(a) in the amount of $1,350.20. Separate petitions were filed with respect to each notice of deficiency. Both cases were consolidated for trial, briefing and opinion by Order of this Court dated April 4, 1979. The primary issue for our decision herein is the amount of petitioners' gross income from gambling for the taxable years before us. FINDINGS OF FACT Some of the facts were stipulated and are so found.The stipulation of *503 facts and exhibits attached thereto are incorporated herein by the reference. Petitioners Berkeley E. and Barbara A. Grove timely filed their joint cash basis Federal income tax return for their taxable year ended December 31, 1973 with the Director of the Baltimore District Internal Revenue Service, Baltimore, Maryland. Petitioner Berkeley E. Grove timely filed his 1974 cash basis Federal income tax return, using the married filing separately status, with the Director of the Baltimore District Internal Revenue Service. At the time the notices of deficiency were mailed, and at the time the petitions were filed, both petitioners resided in Beltsville, Maryland. As petitioner Barbara A. Grove is a party hereto only by virtue of having filed jointly with her husband, "petitioner" as used hereafter shall refer solely to Berkeley E. Grove. Petitioner reported total gross income for his taxable year 1973 in the amount of $9,950. He reported total gross income for his taxable year 1974 of $1,614.50. On February 11, 1974 search warrants were issued, on probable cause, for the following locations and persons: a. The premises located at 2211 First Street, N.W. Washington, D. *504 C., the residence of William Sidney Bland and Martha T. Bland; b. The premises at 6517 Dawnwood Drive, Lanham, Maryland, the residence of Berkeley E. Grove; c. The premises located on the second and third floors of 3829 34th Street, Mt. Rainier, Maryland; d. The persons of Berkeley E. Grove, Michael Steven Gordon, Joseph Francis Gaddi, and William Sidney Bland; and e. A 1966 maroon Ford station wagon belonging to William Sidney Bland. These search warrants were simultaneously executed on February 12, 1974 by special agents of the Federal Bureau of Investigation (FBI). The search warrants were lawful and constitutional.
As a result of the execution of these search warrants, numerous items were seized from the various locations and persons listed above. The evidence seized was turned over to FBI laboratories--which have extensive experience in analyzing numbers operations. The FBI determined, after examining the seized evidence, that the evidence was the type found in and associated with gambling operations handling wagers on numbers based on a three-digit number system. The FBI determined further that the winning numbers for the first two weeks of February 1974 were *505 derived from the results of pari-mutuel horse races at Bowie racetrack in Maryland. As a result of the evidence seized upon execution of the above search warrants, Berkeley E. Grove and three co-defendants, Michael S. Gordon, William S. Bland and Joseph F. Gaddi, were charged with conducting an illegal gambling business (18 U.S.C. section 1955) by indictment filed March 29, 1974. [1] In the same indictment William S. Bland and his wife, Martha T. Bland, were charged with operating a lottery (22 D.C. Code section 1501), possession of numbers slips (22 D.C. Code section 1502), and maintaining a gambling business (22 D.C. Code section 1505). The grand jury specifically charged Berkeley E. Groves as follows: From on or about February 4, 1974, and continuously to on or about February 12, 1974, within the District of Columbia, Berkeley E. Grove, Michael S. Gordon, *506 Joseph F. Gaddi, and William S. Bland, the defendants herein, and others, both known and unknown to the Grand Jury, did unlawfully, willfully and knowingly conduct, finance, manage, supervise, direct and own a part of an illegal gambling business known as the numbers game, being in violation of the laws of the District of Columbia, to wit, Title 22, District of Columbia Code, Section 1501, and involving five or more persons who conduct, finance, manage, direct and own part of said illegal gambling business and having a gross revenue of two thousand dollars in any single day.This is a violation of Section 1955, Title 18 of the United States Code. The essential elements of the offense of conducting an illegal gambling business are that the defendant conduct, manage, supervise, direct, or own all or part of an illegal gambling business. An illegal gambling business is one that is in violation of the laws of the District of Columbia, involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business, and has a gross revenue of $2,000 in any single day. "Gambling" within the meaning of section 1955 includes numbers games. 18 USCS sec. 1955 *507 (b)(2). After various motions to suppress evidence were heard, none of which were granted with respect to Berkeley E. Grove, a jury trial was held commencing October 7, 1974. On October 17, 1974, the jury returned a verdict of "guilty as charged" with respect to Berkeley E. Grove. On January 22, 1975 petitioner was sentenced to one to three years incarceration. A numbers operation like the one before us is one in which bettors gamble on which number, from 0 to 999, will be the winning number on any given day. Each day's winning number is determined that day by the outcome of certain predetermined events with random outcomes, such as the results of preselected horse races. During the taxable years in issue numbers operations such as petitioner's determined their winning numbers with reference to the outcome of certain predetermined pari-mutuel horse races at Bowie racetrack in Maryland. Once a bettor determined the number of which he wished to bet, he would contact a "writer" who would receive the bet and take the amount of the bet from the bettor. The "writer" would then, before a predetermined time each day, call in the bets he had collected to a "backer". Petitioner *508 rented the premises at 3829 34th Street, Mt. Rainier, Maryland, for $300 per month, and used the premises as a "counting house" for the operation, i.e. the place where numbers writers would call in their work. Michael S. Gordon and Joseph F. Gaddi worked inside this address answering two phones and "charting" bets. Both individuals were on a weekly salary of $250. William S. Bland was employed by petitioner as a "settle-up man" who collected amounts owed to or by various numbers writers in the Washington, D.C. area. Both Bland ans his wife were paid salaries of $250 per week. Petitioner was the sole owner of the operation and monitored the betting activity at the counting house by telephone from his residence in Lanham. The process of "charting" bets is one in which the amounts bet through various writers on any number are noted on a chart showing all 1,000 numbers. In this way the total amounts bet on any number can be determined by a backer at a glance. This information will reveal to the backer which, if any, numbers are being more heavily bet than others and how much risk of loss the backer, therefore, faces should any number "hit", i.e. be the winning number. Should *509 a backer determine that his risk on any number is unacceptably high he can "lay off" part or all the bets on that number to a "lay off man". The process of "laying off" a bet shifts the risk of loss, and the probability of gain, to the lay off man. A "settle-up man" is a person who is employed to collect periodically the amounts bet from various writers and to pay off winning bets. Writers are paid a commission of 30 percent of the business they write in consideration for their services. This commission is "off the top". The "settle-up man" will, therefore, collect from the writer 70 percent of the total amount bet with the writer. If a number is laid off, the backer will simply turn this 70 percent over to the lay off man. While charts are roughly kept records of amounts bet on any particular number, and are often in code, "bottom sheets" are records reflecting what moneys are owed to or from various writers. Included in the record were copies of "bottom sheets" seized from the Grove resisence in Lanham on February 12, 1974.These "bottom sheets" cover the period from Monday, February 4, 1974, through Monday, February 11, 1974, excluding Friday, February 8, 1974, which was *510 a "snow day" on which Bowie was closed. In the upper left hand corner of these sheets is shown the winning number of that day. All the bottom sheets included in the record have 8 columns. In the left hand column of the sheets are shown the names of various writers working in petitioner's operation. Counting from the column of names to the right are seven columns of numbers. For Mondays, the first number column represents the gross amount of three-digit "keep-in" bets placed by each individual writer (keep-in bets are bets repeated on a weekly basis until recalled by the bettor). The second column shows the gross amount of regular three-digit bets for that day placed by each individual writer. The third column shows the combined net amount of bets by each individual writer (first and second columns totalled, less commission). The fourth column shows the amount of winnings from the three-digit keep-in and regular bets for the day. The fifth column shows the amount of single-digit bets or double-dight bets during the day.The sixth column shows the amount of winnings on single-and double-digit bets. The last column shows the net balance (after credit for earnings) other the writer *511 would owe at the end of the day. For days other than Mondays the columns remain the same except that there are no keep-in bets. For Mondays, by adding up the first column (the total amount of keep-in bets), the second column (the total amount of regular bets), and the fifth column (the total amount of single- and double-digit bets), the gross amount of wagering income before reduction for writer's commission can be computed. For the other days of the week, the same process can be used except that, as mentioned, there are no keep-in bets. The parties stipulated that "[from] the beginning of 1973 until execution of the search warrants on February 12, 1974, Berkeley E. Grove was the backer of a numbers operation." Indeed, the record clearly shows by evidence independent of this stipulation that petitioner was in the numbers racket operating as a backer from at least January 1973. Excluding Sundays, holidays and snow days when the recetrack was closed, we find that petitioner operated his numbers business for a total 310 days in 1973 and 35 days in 1974, i.e. from January 1, 1974 to February 12, 1974 when the operation was raised. The bottom and charting sheets reflected the *512 following amounts of bets on the following dates: Date
Bottom Sheets
Charting Sheets
Difference
Mon. 2/4/74
$ 5,141.00 *
$ 5,825.00 *
$ 684.00
Tues. 2/5/74
3,411.00
5,137.00
1,726.00
Weds. 2/6/74
3,145.00
4,544.00
1,399.00
Thurs. 2/7/74
3,815.00
5,181.00
1,366.00
Sat. 2/9/74
4,052.00
5,938.00
1,886.00
Mon. 2/11/74
4,367.00 *
5,203.00 *
836.00
TOTAL
$23,931.00
$31,828.00
Average per day
$ 3,988.50
$5,304.67
The bottom sheets did not reflect all the amounts bet. Only the betting records for these six days were found in the records. The paucity of records of petitioner's income is due to the fact that petitioner systematically destroyed his records. Also seized from petitioner's residence on February 12, 1974, were sheets showing "cut" numbers. "Cut numbers" are numbers the odds on which have been "cut" or reduced. Thus, while the normal number will pay off at odds of 600 to 1, cut numbers will pay off at odds of 400 to 1 or even 200 to 1. Cutting a number is a means of reducing risk on that number. Backers uniformly cut those numbers which are most often played. The effect of this is *513 to reduce their average outlay for winnings. A printed cut card and hand written list of cut numbers were seized from petitioner's person. While most of the evidence seized under the above described search warrants was destroyed by the FBI after the criminal appeals process ended, a summary list of such information was included in the record. Based upon the evidence presented at trial we find that petitioner paid the following expenses related to his business during the taxable years before us: Rent:
$300 per month
Salaries:
$250 per person for 4 persons per
week for 50 weeks in 1973 and 6 weeks
in 1974.
Phone:
$20 per month
Attorney fees:
$1,000 per year
OPINION In his statutory notices of deficiency for the years 1973 and 1974, respondent determined that Berkeley E. and Barbara A. Grove had unreported gross income in the amount of $1,620,193 for their taxable year 1973, and that Berkeley E. Grove had unreported income in the amount of $182,925 for the taxable year 1974. Respondent based these income amounts on his conclusion that petitioner had average daily gross receipts from gambling of $5,226.43 for 310 days in 1973 and 35 days in 1974. *514 This daily gross amount was derived solely from interpreting the amounts appearing on the charting sheets introduced in the criminal record. Sunday, holidays and snow days were excluded from the computations of gambling days since the recetrack at Bowie was closed on those days. In 1974 the computations were made up to the day the FBI executed the search warrants described above. While petitioner does not dispute the allegation that he intentionally underreported his income from gambling during the taxable years in issue, he argues, using the bottom sheets, that his income was substantially less and expenses much higher than allowed by respondent. This case requires the Court to determine, therefore, as best it can, petitioner's gross income from backing a numbers operation during the taxable years before us. The issue is purely a factual one. The burden is upon petitioner to prove his case by a preponderance of the evidence. Welch v. Helvering,290 U.S. 111, 115 (1933). Petitioner did not challenge the deficiency notice herein as arbitrary, capricious and excessive. Given the state of the record and the stipulations herein to have done so would have been *515 bootless. See Jackson v. Commissioner, 73 T.C. (Nov. 28, 1979). Subsumed under the general issue of gross income amount are three subissues: (1) petitioner's gross receipts from gambling, (2) petitioner's pay outs to winners, and (3) petitioner's allowable and substantiated business expense deductions. With respect to the first question, we note that all taxpayers, including those engaging in a business such a petitioners, are required to "keep such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits or other matters required to be shown" in any return of tax. Section 1.6001-1(a), Income Tax Regs., see Plisco v. United States,306 F.2d 784, 786-787 (D.C. Cir. 1962). Where a taxpayer keeps no books or records, or his records are inadequate, or where the taxpayer deliberately destroys his records, the Commissioner is authorized to compute income by whatever method will, in his opinion, clearly reflect the taxpayer's income. No particular method is required since the circumstances will vary in individual cases. Harbin v. Cimmissioner,40 T.C. 373, 377 (1963), see also *516 Agnellino v. Commissioner,302 F.2d 797, 799 (3rd Cir. 1962), affg. on this issue a Memorandum Opinion of this Court. Certainly, where the taxpayer has deliberately and willfully failed and refused to keep and maintain any books or records of his business transactions, or when the taxpayer has destroyed such records, the courts have not required of the Commissioner mathematical exactness in determining the taxpayer's income. Harbin v. Commissioner, supra at 377.
Indeed the courts have reacted flexibly in fashioning allowable methods of income reconstruction in cases such as the one before us. Thus, they have permitted the Commissioner to reconstruct a taxpayer's income by computing the average daily gross gambling revenues received over periods as short as one day and then projecting such average daily gross gambling income over the entire period of gambling activity shown. See e.g. Gordon v. Commissioner,63 T.C. 51, 61 (1974), modified 63 T.C. 501 (1975), affd. per curiam 572 F.2d 193 (9th Cir. 1977) (1 day); Fiorella v. Commissioner,361 F.2d 326 (5th Cir. 1966); affg. per curiam a *517 Memorandum Opinion of this Court (2 days); Gerardo v. Commissioner,552 F.2d 549, 551, 553 (3rd Cir. 1977), affg. on this issue a Memorandum Opinion of this Court (3 days); and Mitchell v. Commissioner,416 F.2d 101, 101 (7th Cir. 1969), affg. a Memorandum Opinion of this Court (4 days). The rule was recently stated by the Third Circuit as follows: Where unreported income from gambling is at issue, the projection of average daily gross receipts over a period of time in order to calculate gross income is an acceptable method of reconstruction. [Gerardo v. Commissioner,supra at 552 n. 6.] While the Courts have been flexible in meeting the exigencies of income reconstruction in gambling cases, they have required that there be an adequate showing of the period over which it is appropriate to project the average daily gambling income amounts determined from what records are seized. Thus in the case of Pizzarello v. United States,408 F.2d 579 (2nd Cir. 1969), the taxpayer had been arrested on April 15, 1965 and charged with operating a book making establishment from March 30, 1965 to April 15, 1965. Following *518 a dismissal of the criminal charges due to his illegal arrest, the Commissioner issued a jeopardy assessment for the period from April 1, 1960 through April 15, 1965. Pizzarello produced no records to contradict the Commissioner's assessment. The Second Circuit held that the assessment was excessive and arbitrary because "there is no proof in the record before us that Pizzarello operated as a gambler for 5 years. * * * No court could properly make such inferences without some foundation of fact." Pizzarello v. United States,supra at 583. See also Gerardo v. Commissioner,supra at 553-555. The case before us presents no such problem. The stipulations and stipulated exhibits clearly show that petitioner was operating as a backer for a numbers operation no later than January 1973. Our belief that petitioner was operating as the backer of a numbers operation no later than January of 1973 is reflected in our finding that petitioner operated his business a total of 310 days in 1973 and 35 days in 1974. Turning, then, to the question of petitioner's total gross receipts from gambling operations in 1973 and 1974, two sources from which a determination *519 of these amounts could be made were included in the record, i.e. photostatic copies of the bottom sheets for the six days in February 1974 referred to in the facts above, and the testimony of an FBI expert on gambling with respect to the amounts which he recalled appeared on the charting sheets seized for those same days, which charting sheets had been destroyed by the FBI in due course after the conclusion of the criminal appeal in petitioner's case. The charting sheets are relied upon by respondent as the true indicators of petitioner's gross wagering receipts. Respondent argues that these charts show that petitioner had gross wagering receipts of $5,226.43 per day during the taxable years before us. Petitioner argues that the charting sheets were used simply to keep a rough record of what numbers should be layed off and in what amounts. Thus, argues petitioner, as the charting sheets were used for purposes of determining the necessity of purchasing what was in effect insurance, they err on the high side and amounts thereon are overstated. Petitioner's position, thus, appears to be that his version of the bottom sheets should be used as the basis for our computations herein. *520 [2] On brief petitioner estimates his net profit per day at $266 or $82,460 for 1973 from which he subtracted $55,400 in expenses for a net profit of $27,060. Respondent, by way of his expert, argues that there would be no reason to overchart and that the higher numbers on the charting sheets could indicate a second undisclosed source of betting income not shown on the bottom sheets. Respondent does concede, however, the accuracy of the bottom sheets, at least as far as they go. Both parties agree, therefore, that the bottom sheets give some indication of petitioner's betting receipts.Neither party agrees, however, what amounts these sheets show. The bottom sheets were kept for the purposes of determining income and outgo. So some extent, therefore, they carry with them their own internal assurances of accuracy. The charting sheets, on the other hand, were merely rough tallies for lay off purposes. They are certainly not as reliable indices of petitioner's actual gross wagering receipts *521 as even the bottom sheets would appear to be. On the other hand, while the bottom sheets are more valuable to our determination herein than the charting sheets, we cannot attribute total accuracy to them. We note that respondent's expert testified that the bottom sheets did not reflect all the bets made although he obviously could not know the precise amount of omitted receipts. We are compelled to estimate, a necessity caused by the petitioner's failure to keep appropriate records. Thus, applying principles analogous to those described in Cohan v. Commissioner,39 F.2d 540, 544 (2nd Cir. 1930), we conclude that petitioner received an additional $211.50 in gambling receipts over and above those amounts we have found reported on the bottom sheets making a total of $4,200 per day in gross wagering receipts for 310 days in 1973 and 35 days in 1974. [3]
*522 We have previously found that 30 percent of the total amounts bet with petitioner's operation was retained by the writers as their commission. The remaining 70 percent was, therefore, paid over to petitioner. Next we must determine the average pay out made by petitioner on the amounts bet with him. We have referred to the cut cards seized from petitioner's business during the FBI raids. These cards contained a list of 104 numbers. Petitioner argues that these 104 numbers were the only numbers cut and that they were all cut to odds of 400 to 1. This would yield a net average pay out of 57.92 percent on the gross amounts bet within petitioner's business. Respondent argues through his expert that there was a total of 329 numbers cut. This argument is based on the theory that some of the 104 numbers were cut in combination, meaning that all permutations of the numbers listed were cut. Respondent goes on to argue that the evidence shows that 314 of these 329 numbers were cut to odds of 300 to 1 and 15 numbers were cut to odds of 200 to 1.Under this theory petitioner's average outlay would be 44.7 percent of the amounts bet. After reviewing the evidence we do not believe that *523 we can accept either party's theory in full. We accept respondent's claim that more than the 104 numbers on the cut cards were cut. At the same time respondent's claim that 329 numbers were cut to the odds stated above remains supported only by the testimony of his expert.While this expert was clearly knowledgeable his testimony was of necessity vague, given the fact that the actual evidence itself had been destroyed and of the passage of time. On the other hand, we cannot accept petitioner's claim that only 104 numbers were cut and that all were cut to odds of 400 to 1. We believe it appropriate, therefore, to once again apply principles analogous to those applied in Cohan v. Commissioner,supra at 544, in determining that petitioner paid out 50 percent of the gross amounts bet to winners.
Finally we must determine petitioner's allowable business expense deductions. The tax law does not concern itself with the lawfulness of the income that it taxes. Income from a criminal enterprise is taxed at a rate no higher and no lower than income from more conventional sources. Commissioner v. Tellier,383 U.S. 687, 691 (1966). The amounts which *524 we have found were expended by petitioner to support his business must therefore be allowed as deductions against the income we have found he had during the taxable years in issue. Commissioner v. Sullivan,356 U.S. 27, 28-29 (1958). We note in this connection that at the trial herein petitioner indicated that he had bad debts of between 3 and 4 percent of gross receipts. We find this estimate reasonable in view of the shady nature of petitioner's business and allow 4 percent.
Having thus determined petitioner's substantiated business expense deductions, we may summarize our findings with respect to his income as follows: 1973
1974
Gross wagering receipts
$1,302,000
$147,000
Commissions to writers
390,600
44,100
Gross income
911,400
102,900
Bad debts
(36,456)
(4,116)
Pay outs to winners
(651,000)
(73,500)
Gross income net of pay outs
223,944
25,284
Allowable business expense
deductions
(54,840)
(6,723)
NET GAMBLING INCOME
$ 169,104
$ 18,561
The final issue with which we must deal is the correctness of respondent's claim for the negligence addition to tax described in section 6653(a) for both of the taxable years before *525 us. At all times relevant section 6653(a) read as follows: SEC. 6653.FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes.-- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.
The burden is upon petitioner to show that this addition to tax is improperly claimed. Enoch v. Commissioner,57 T.C. 781, 802-803 (1972), Smith v. Commissioner,66 T.C. 622, 651 (1976). Petitioner's failure to maintain such records as would be adequate to serve as the bases for even rough estimations of his income and deductions in violation of the requirements of section 1.6001-1(a), Income Tax Regs., and the destruction of records, accompanied by his deliberate and gross understatement of income, indicates to us that quantum of intentional disregard of rules and regulations sufficient to sustain respondent's determination. Indeed petitioner admitted that he deliberately *526 understated his income and made no attempt to oppose the respondent's imposition of section 6653(a) addition to tax. On brief petitioner implies that a requirement that he report his gambling income could violate his right against self-incrimination. It was long ago settled that taxpayers receiving income from criminal causes must still report that income. United States v. Sullivan,274 U.S. 259, 263-264 (1927). But even were this not the case, the appropriate time to claim the protection of the Fifth Amendment was on the return itself. Garner v. United States,424 U.S. 648, 653-657, 665 (1976). A taxpayer must either report his true income of claim the privilege. He cannot do neither. We confirm respondent's determination that the addition under section 6653(a) is due. See Smith v. Commissioner,supra at 651, Harbin v. Commissioner,40 T.C. 373, 379 (1963). Decisions will be entered under Rule 155.
Footnotes
1. 18 U.S.C. sec. 1955 provides, "Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both." 18 USCS sec. 1955↩.
*. Mondays include keep-ins↩
2. Indeed petitioner supplied the Court's with legal pads of paper on which he had recopied the amounts shown on the bottom sheets, the photostatic copies of which were rather smudged.↩
3. The determination of petitioner's true gross wagering receipts was rendered difficult by petitioner's failure to keep books or records and his systematic destruction of what records were kept. The difficulties engendered by the lack of records herein is indicated by the following: While it was respondent's position that petitioner had gross wagers placed with his business of $5,226.43 per day, he did so on the basis of the charting sheets which our computations show indicated a daily gross bet of $5,304.66↩