THOMAS CAMPISE AND MARGARET CAMPISE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Campise v. Commissioner
Docket No. 7412-78.
United States Tax Court
T.C. Memo 1980-130; 1980 Tax Ct. Memo LEXIS 458; 40 T.C.M. (CCH) 211; T.C.M. (RIA) 80130; April 21, 1980, Filed Robert H. Lynn, for the petitioners. M. K. Mortensen, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Addition to Tax Year
Deficiency
Section 6653(b) [1]
1972
$ 6,289.63
$3,144.82
1973
10,146.44
5,073.22
1974
4,134.96
2,067.48
The issues presented for decision are: 1. Whether in the circumstances *461 of this case the respondent has the burden of proof with respect to the deficiencies determined for years 1972 through 1974. 2. Whether petitioners understated their taxable income from the operation of Tommy's Arcade in the amounts of $8,978 and $1,539 for the years 1972 and 1973, respectively. 3. Whether petitioners understated their taxable income from T & J Enterprises in the amounts of $10,333.65, $25,542.98 and $13,023.04 for the years 1972, 1973, and 1974, respectively. 4. Whether any part of the underpayment of tax for each of the years 1972, 1973, and 1974 was due to petitioners' fraud with intent to evade tax. 5. Whether the assessment of any deficiencies for the years 1972, 1973 and 1974 is barred by the statute of limitations. 6. Whether respondent correctly disallowed certain business expenses claimed by T & J Enterprises in the amounts of $5,959.61 for 1972, $636.87 for 1973 and $155.77 for 1974. 7. Whether petitioners are liable for self-employment taxes of $675, $864 and $1,042.80 for 1972, 1973 and 1974, respectively. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation of facts and exhibits attached thereto *462 are incorporated herein by this reference. Thomas Campise and Margaret Campise (hereinafter petitioners) are husband and wife who resided in San Diego, California, when their petition was filed in this case. On or about April 15, 1973 petitioners filled an unsigned Federal income tax return for the year 1972. They filed timely Federal income tax returns for the years 1973 and 1974. Respondent sent his notice of deficiency to petitioners covering the years 1972, 1973 and 1974 on April 15, 1978. During 1972 and 1973 petitioners owned and operated a business known as Tommy's Arcade (hereinafter Arcade). The Arcade sold magazines, books and paraphernalia of a sexual nature and operated peep show machines. The Arcade was managed by Thomas Campise (hereinafter petitioner). The receipts from the sale of books and paraphernalia were totaled daily by petitioner and logged daily in a ledger by his wife. Receipts from the peep show machines were removed daily from the machines and totaled weekly by petitioners. This amount was also recorded in a ledger maintained by Mrs. Campise. The ledger books reflect gross receipts from the sale of books and paraphernalia and the operation *463 of the peep show machines as follows: Receipts from
Books and
Receipts from Year
Other Paraphernalia
Peep Shows
Total
1972
$3,785.86
$8,978.00
$12,763.86
1973
621.00
2,336.00
2,957.00
On their unsigned Federal income tax return form for 1972 the petitioners reported $3,786 as gross receipts from the Arcade. On their 1973 income tax return they reported $1,418 as gross receipts from the Arcade. In 1971 the petitioner and Pasquale John Antonello (Antonello) purchased a building known as the Lark Hotel, consisting of the street addresses 715 through 719 Fourth Avenue, San Diego, California. During 1972, 1973 and 1974, a partnership known as T & J Enterprises operated a massage parlor business at 715 Fourth Avenue. Petitioner and Antonello each owned 50 percent of the partnership. The business operated by T & J Enterprises was known as the Harem Massage and the Harem Health Spa. A license to operate the massage parlor was issued to petitioner and Antonello on May 16, 1972 and remained in effect until September 14, 1975. Although sauna and gymnastic equipment were available at the Harem Massage, over 90 percent of its business was from *464 massages, which were performed only by females. Various types of massages were available at the Harem Massage including regular, topless, nude and switch massages. From August, 1973 through June, 1974 petitioner and Antonello employed the services of John Lee (hereinafter Lee) to manage the Harem Massage. Upon entering the massage parlor a customer would pay for the massage at the front desk and a receipt would be issued. Of the money collected for a massage, a masseuse would receive 40 percent of the fee. The masseuses were paid in cash each evening. In addition to paying the masseuses, Lee would also pay the expenses for linens and supplies. Linen deliveries of towels and sheets were generally made two or three times a week by American Linen Supply. Upon delivery of the linens and payment of the necessary charges by Lee an invoice for the linens was left at the Harem Massage. The linen invoices, together with the cash receipts from massages less the payouts to the masseuses, were given to Antonello each evening by Lee. The Linen invoices for the periods May, 1972 to June, 1972 and October, 1972 to December, 1974 were provided to respondent by Antonello. Antonello informed *465 respondent that the invoices for July through September 1972 were missing. Beginning on October 1, 1973 and continuing through June 23, 1974, Lee kept detailed records of the massage parlor's gross receipts, payouts to the masseuses, and expenditures for linens and other supplies. According to Lee's records, the gross receipts of the Harem Massage from October, 1973 to June, 1974 were as follows: Month & Year
Gross Receipts
October 1973
$10,233
November 1973
10,056
December 1973
10,708
January 1974
9,626
February 1974
9,354
March 1974
14,395
April 1974
8,881
May 1974
6,789
June 1974
6,064
Revenue Agent Peters audited petitioners and T & J Enterprises in 1975. No partnership returns were filed by T & J Enterprises for 1972, 1973 or 1974. Peters requested all the books and records of T & J Enterprises during the audit of it and petitioners. He received from Antonello only some envelopes which contained expense receipts of T & J Enterprises, the linen invoices and a series of notes made by Antonello to his bookkeeper containing income figures for various quarters of the years in issue. Before Antonello gave the gross receipts information to *466 the bookkeeper he misplaced numerous copies of the customer receipts and envelopes containing the gross receipt figures. The figures given the bookkeeper were not accurate. According to Antonello's handwritten notes which were provided to the bookkeeper, the gross receipts from the massage parlor during the period May 1972 to December 1972 were as follows: Month
Amount
May
$ 426.50
June
2,336.50
July
3.935.00
August
3,935.00
September
3,935.00
October
5,621.50
November
4,801.00
December
5,475.50
The amounts listed above were characterized by Antonello as "rent" paid to T & J Enterprises by the masseuses. The figures for August and September 1972 were based on the July amount since Antonello had informed his bookkeeper that the records were lost for those months. According to Antonello the amounts shown above, less expenses for linens and other supplies, represented the taxable income of Harem Massage for 1972. No records of massage parlor receipts other than the handwritten notes of Antonello for the period May to December 1972 (and the records kept by Lee from October 1973 to June 1974) were provided to respondent or presented at trial. *467 In the absence of gross receipt records for T & J Enterprises for 1973 and 1974 (other than Lee's records given respondent during the audit of petitioners) and respondent's belief that the records given to Mr. Peters by Antonello for 1972 were inadequate, the revenue agent used a towel count method of reconstructing T & J Enterprises for 1972, 1973 and 1974. Mr. Peters compared the gross receipts for each of the months for which Lee kept records with the number of towels used for each of such months as indicated on the linen invoices. The following average amounts per towel per month were computed: Gross
Number of
Amount per Towel Month & Year
Receipts
Towels
per Month
October 1973
$10,233
1,408
7.26
November 1973
10,056
1,244
8.08
December 1973
10,708h1,441
7.43
January 1974
9,626
1,483
6.74
February 1974
9,354
1,248
7.49
March 1974
14,395
1,955
7.36
April 1974
8,881
1,637
5.42
May 1974
6,789
1,053
6.44
June 1974
6,064
883
6.86
Total Gross Receipts
$86,106.00
Total Towels
12,352
Average Amount per Towel
$6.97
Adjusted Average Amount
per Towel
$6.91
Using the amount of $6.91 per towel and *468 the number of towels used each month as indicated on the linen invoices, Mr. Peters extrapolated the gross receipts per month for the months prior and subsequent to the months for which John Lee kept records for the years in issue, as follows: Number of
Average
Respondent's Calculation Month & Year
Towels Used
Amount
of Gross Receipts
May 1972
347
6.91
$ 2,397.77
June 1972
1,578
6.91
10,903.98
July 1972
* 1,564
6.91
10,807.00
August 1972
* 1,564
6.91
10,807.00
September 1972
* 1,564
6.91
10,807.00
October 1972
1,550
6.91
10,710.50
November 1972
2,598
6.91
17,952.18
December 1972
2,826
6.91
19,527.66
TOTAL 1972
$93,913.09
January 1973
2,057
6.91
$14,213.87
February 1973
1,527
6.91
10,551.57
March 1973
1,993
6.91
13,771.63
April 1973
1,949
6.91
13,467.59
May 1973
1,754
6.91
12,120.14
June 1973
2,359
6.91
16,300.69
July 1973
1,981
6.91
13,688.71
August 1973
1,412
6.91
9,799.28
September 1973
1,284
6.91
8,910.96
October 1973
** 10,233.00
November 1973
** 10,056.00
December 1973
** 10,708.00
TOTAL 1973
$143,821.44
*469 Number of
Average
Respondent's Calculation Month & Year
Towels Used
Amount
of Gross Receipts
January 1974
$ 9,626.00 **
February 1974
9,354.00 **
March 1974
14,395.00 **
April 1974
8,881.00 **
May 1974
6,789.00 **
June 1974
6,064.00 **
July 1974
999
6.91
6,903.09
August 1974
645
6.91
4,456.95
September 1974
893
6.91
6,170.63
October 1974
596
6.91
4,118.36
November 1974
720
6.91
4,975.20
December 1974
1,179
6.91
8,146.89
TOTAL 1974
$89,880.12
*470 ULTIMATE FINDINGS OF FACT 1. Petitioners and T & J Enterprises failed to maintain adequate books and records for the taxable years 1972 through 1974. 2. Petitioners reported gross income on their Federal income tax returns of $10,649 for 1972, $26,122 for 1973 and $17,666 for 1974. They omitted from their Federal income tax returns gross income of $19,311.65 for 1972, $27,081.98 for 1973 and $13,023.04 for 1974. 3. Petitioners understated the taxable income they received from Tommy's Arcade in the amounts of $8,978 for 1972 and $1,539 for 1973. 4. Petitioners understated the taxable income received from T & J Enterprises in amounts of $10,333.65 for 1972, $25,542.98 for 1973 and $13,023.04 for 1974. 5. A part of the underpayment of income tax for each of the years 1972, 1973 and 1974 was due to the fraud of petitioners. 6. The assessment of the deficiencies determined for each of the years 1972, 1973, and 1974 is not barred by the statute of limitations. 7. Petitioners failed to prove that they are entitled to claimed business expenses of $5,959.61 for 1972, $636.87 for 1973 and $155.77 for 1974 which were disallowed by respondent. 8. Petitioners are *471 liable for self-employment taxes of $675 for 1972, $864 for 1973 and $1,042.80 for 1974. OPINION Issue 1. Burden of Proof
Petitioners contend that since respondent mailed the notice of deficiency to them more than three years after they filed their Federal income tax returns for the years 1972, 1973 and 1974, the burden of proof with respect to the deficiencies, as well as the additions to tax for fraud under section 6653(b), must be borne by the respondent. Although respondent does have the burden of proving exceptions to the three year statute of limitations for assessment under section 6501(a), the petitioners have the burden of refuting respondent's determination with respect to the deficiencies. See George v. Commissioner, 338 F.2d 221, 223 (1st Cir. 1964). Of course, when respondent relies on section 6501(e)(1)(A), he must establish that the petitioners omitted from gross income an amount in excess of 25 percent of the gross income stated in their returns for each *472 year. Petitioners' reliance on Armes v. Commissioner, 448 F.2d 972 (5th Cir. 1971), is misplaced. That case does not stand for the proposition that respondent bears the burden of proof on all matters, including the existence of the deficiency, after the three year period of limitations has expired, but only that respondent must prove his entitlement to the exception to the three year period contained in section 6501(e)(1)(A). The issues relating to the application of the statute of limitations will be dealt with later in this opinion. Issue 2. Understatements of Income--Tommy's Arcade
During 1972 and 1973 petitioners owned and operated a business known as Tommy's Arcade, an adult book store and peep show operation. Thomas Campise would total the Arcade's receipts from the sale of books and other paraphernalia on a daily basis and his wife would record the amount in a ledger book. Receipts from the peep show machines were collected daily, tallied weekly by petitioner and recorded in the ledger book. The receipts from book and paraphernalia sales for 1972 totaled $3,785.86 and the receipts from peep show machines totaled $8,987. Petitioners reported *473 only the receipts from the book and paraphernalia sales on their unsigned in 1972 income tax return. In 1973 the receipts from books and peep show machines were $621 and $2,336, respectively. Petitioners reported $1,418 as total receipts from the Arcade on their 1973 income tax return. Petitioners contend that there was no understatement of income in 1972 and 1973 with respect to the Arcade operation. They maintain that all receipts were properly reported. Unfortunately for petitioners, their argument is not supported by the books and records they kept for those years. The ledger pages for 1972 and 1973 show the receipts from the book sales and peep show machines. Petitioners have not explained these entries as being anything but receipts from the Arcade operations. Therefore, we sustain respondent's determination with respect to the understatements of income from the Arcade in the amounts reflected in our ultimate findings of fact. Issue 3. Understatements of Income--T & J Enterprises
Petitioner and Antonello were equal partners in T & J Enterprises, which ran a licensed massage parlor. Petitioner visited the parlor on a daily basis, received his share of the profits *474 each week in cash and was familiar with the records of gross receipts, payouts to masseuses and other expenditures maintained by the manager from October 1973 to June 1974. Generally, Antonello handled whatever records the partnership entity maintained, including copies of the linen invoices and some fragmentary income figures for 1972. Since T & J Enterprises had inadequate book and records, the respondent found it necessary to reconstruct its income under the provisions of section 446(b). See Harbin v. Commissioner, 40 T.C. 373 (1963). [2] The only records that were maintained to any degree were the linen invoice expenses. Respondent determined the monthly gross receipts from the massage parlor by computing an average gross receipt figure per towel used. He used the gross receipt figures kept by Lee, the parlor's manager, during the period from October 1973 to June 1974 and divided each month's gross receipts by the number of towels used each month as set forth in the linen invoices supplied by Antonello.After computing the average gross receipt per towel for each month while Lee was keeping records, respondent determined the overall weighted average per towel *475 for that period. Slightly discounting the weighted average figure obtained, he multiplied that figure by the number of towels used each month to determine the gross receipts for the periods from May 1972 to December 1972, January 1973 to September 1973 and July 1974 to December 1974. From the figures obtained for each month, respondent subtracted 40 percent of the amount as representing payments made to masseuses. These corrected gross receipt figures were compared to the gross receipt figures appearing on the schedules attached to petitioners' Federal income tax returns for 1973 and 1974 showing the receipts from the massage parlor. One half of the unreported gross receipts was attributed to petitioner in view of his 50 percent interest in the partnership. The corrected gross receipt figure for 1972 was compared to the gross receipt figure on petitioners' 1972 income tax return which was computed by adding a certan amount of allowed expenses to the taxable income of the partnership shown on the return. *476 Petitioners argue that the method of reconstruction used by respondent was arbitrary because it used for each year the dollar figures sampled from the period when Lee was manager and did not account for lower massage prices which they claim were charged before Lee's employment. They contend that the method distorted their gross income because it failed to consider towels used in nonmassage activities, such as gymnastic workouts by paying customers and non-paying owners. They further contend that T & J Enterprises maintained adequate books and records. We reject the petitioners' assertion that the method used by respondent was arbitrary because it fails to take into account lower prices charged by the massage parlor prior to Lee's tenure. Other than this bald assertion, petitioners have offered no credible evidence as to how much lower the prices were before Lee became the manager. Moreover, an inference can be drawn that prices increased after Lee's tenure and that the average per towel is too low for that period. In short, petitioners attempt to condemn respondent for an inexactitude of their own making. The only gross receipt "records" that petitioners offered from the *477 partnership are some fragmentary "rent" receipts for 1972 prepared by Antonello and given to the partnership's bookkeeper. Antonello admitted at trial that these records were not accurate. In addition, for two of the months in 1972, Antonello informed the bookkeeper to use as the amount of receipts the previous month's total of receipts. In the absence of any credible evidence, we find that the method used by respondent was not arbitrary because it used data from a part of the years at issue rather than from the entire period. Petitioners' second argument likewise fails to persuade us. It is clear from the evidence that the predominant business of T & J Enterprises during the years 1972, 1973 and 1974 was the operation of a massage parlor. We accept Lee's testimony that over 90 percent of the business of the massage parlor was the giving of massages, and not the use of whatever sauna or gymnastic facilities were available. While petitioners attempt to refute that percentage for the period prior to Lee's management, we have observed that in the handwritten notes given to the partnership's bookkeeper by Antonello listing 1972 "rent" receipts from the "girls," there is no indication *478 of additional rent from the use of the sauna or gym facilities. Accordingly, we think that most, if not all, of the towels were used in direct conjunction with the massage business. We also think the petitioners have misconstrued the mechanics of respondent's methodology. Since we accept as correct Lee's figures of gross receipts and the linen invoice records for the entire three year period, the average amount per towel seems to represent a reasonable method of computing gross income from each towel. Obviously, if some part of the gross receipts are from nonmassage activities, the average income per towel would still be correct. Petitioners' final argument is that T & J Enterprises kept adequate books and records, that respondent microfilmed all of them and that the original records were subsequently destroyed by a fire not caused by them. Petitioners refer to the testimony of Antonello and Revenue Agent Peters in support of this argument. We disagree. Mr. Peters did not testify that complete books and records of T & J Enterprises were produced and microfilmed but that Antonello turned over to him only linen invoices and some fragmentary notes of gross receipts for 1972. *479 Antonello's testimony likewise does not support the argument, but indicates that he did not maintain complete and accurate books and records. Petitioners have simply failed to show that T & J Enterprises kept adequate books and records. Accordingly, we sustain both respondent's methodology and the amount per towel used in determining the corrected gross receipts for T & J Enterprises during the years 1972, 1973 and 1974. Petitioners have understated their income from T & J Enterprises by the amounts reflected in our ultimate findings of fact.
Issue 4. Additions to Tax under Section 6653(b)
Next we must decide whether any part of the underpayment of tax for each of the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b). The Commissioner bears the burden of proving fraud, and he must do so by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Levinson v. United States, 496 F.2d 651 (3d Cir. 1974), cert. denied 419 U.S. 1040 (1974); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); *480 Estate of Temple v. Commissioner, 67 T.C. 143 (1976); Imburgia v. Commissioner, 22 T.C. 1002 (1954). To establish fraud the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968); Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Acker v. Commissioner, 26 T.C. 107, 112-113 (1956). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Since fraud can seldom be established by direct proof, the taxpayer's entire course of conduct is often relied on to establish circumstantially such fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); *481 Otsuki v. Commissioner, supra at 105-106. In our judgment the evidence in this case clearly and convincingly establishes that the petitioners fraudulently underpaid their tax for each of the years 1972, 1973 and 1974. Their Federal income tax returns understated their income by $19,311.65 in 1972, $27,081.98 in 1973 and $13,023.04 in 1974. Such a consistent pattern of substantial understatements of income over a period of years, standing alone, is persuasive evidence of fraud. Holland v. United States, 348 U.S. 121, 139 (1954); Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970); Estate of Upshaw v. Commissioner, 416 F.2d 737, 741 (7th Cir. 1969); Agnellino v. Commissioner, 302 F.2d 797, 801 (3d Cir. 1962); Schwarzkopf v. Commissioner, 246 F.2d 731, 734 (3d Cir. 1957); Harper v. Commissioner, 54 T.C. 1121, 1139 (1970). There are also other indicia of fraud present in this case. First, the petitioners were familiar with the actual gross receipts of Tommy's Arcade since *482 Thomas Campise managed the store, tallied the receipts from the sale of books and peep show machines and his wife generally recorded the receipt figures in a ledger book. The returns prepared by their accountant were reviewed by petitioners prior to their being mailed and the gross receipts figures in Schedule C attached to their 1972 and 1973 income tax returns were clearly inconsistent with their own books and records. Second, no effort was made by the partnership to maintain adequate books and records of gross receipts to the partnership and its distributions to the partners. We find it highly improbable that the petitioners had no knowledge of the partnership's income and expense figures other than the figures given them by Antonello at yearend. Thomas Campise was personally involved in the operation of the Harem, visiting the massage parlor daily and receiving his share of the earnings in cash each week. The difference in reported receipts compared to the actual receipts received by him is too great for us to view him as an unaware silent partner. Finally, we think the petitioner and T & J Enterprises attempted to conceal their operation of the Harem massage parlor as though *483 they had leased the business to John Lee. Accordingly, after examining and evaluating all the evidence contained in this record, we have found and hold that part of the underpayments of tax for each of the years at issue was due to the fraud of the petitioners. Thus, we sustain the additions to tax under section 6653(b). Issue 5. Statute of Limitations
Having found that a part of the underpayment of tax in each of the years 1972, 1973 and 1974 was due to fraud with intent to evade tax, it follows that the assessment of deficiencies for such years is not barred by the statute of limitations. See section 6501(c)(1). In any event, we have concluded as reflected in our ultimate finding of fact, that the amounts omitted by the petitioners from their gross income for each of the years exceeded 25 percent of the gross income stated in their tax returns. Consequently, under the provisions of section 6501(e)(1)(A) it is clear that the assessment and collection of deficiencies in petitioners' Federal income taxes for the years 1972 through 1974 are not barred by the statute of limitations. Even in the absence of fraud or a 25 percent omission of gross income, the three year *484 period for assessment under section 6501(a) has not run for 1972 and 1974. With respect to 1972 the petitioners failed to sign their income tax return. Section 6501(c)(3) provides that in the case of a failure to file a return the period of limitation does not begin running. Sections 6061 and 6065 provide that any return shall be signed and verified by written declaration that it is made under the penalties of perjury.A return that is not signed is not a return for purposes of section 6501 and does not start the running of a period of limitation for assessment. Richardson v. Commissioner, 72 T.C. 818, 823 (1979); Vaira v. Commissioner, 52 T.C. 986 (1969), revd. on other grounds 444 F.2d 770 (3d Cir. 1971); Doll v. Commissioner, 358 F.2d 713 (3d Cir. 1966); Reaves v. Commissioner, 31 T.C. 690 (1958), affd. 295 F.2d 336 (5th Cir. 1961). With respect to 1974 we reject petitioners' contention that the three year period of limitation for that year expired on April 14, 1978 because 1976 was *485 a leap year. Section 6501(a) provides that the tax may be assessed within three years after the return is filed. Section 6501(b) provides that if a return is filed before the last day prescribed for filing a return, then the return shall be considered as filed on such last day. Section 6072(a) provides that the time for filing individual income tax returns shall be on or before April 15 following the close of the calendar year. If the 1974 return was filed on or before April 15, 1975 the three year period of limitation specified in 6501(a) did not begin to run until after April 15, 1975. The day the return is filed or considered to be filed under section 6501(b) is excluded in computing the period for assessing the tax. Burnet v. Willingham Loan & Trust Co.,282 U.S. 437 (1931). Thus, the three year period began to run on April 16, 1975 and expired on April 15, 1978. Since the notice of deficiency was mailed on April 15, 1978, it is timely and suspends the running of the period for assessment.Section 6503(a)(1). Petitioners' argument that the extra day in 1976 *486 should be considered is unpersuasive. The statutory language is expressed in terms of years, not days. Accordingly, the respondent is not barred by expiration of the three year period for assessment for the year 1974. Issue 6. Claimed Business Expenses
Respondent disallowed certain business expenses in the amount of $5,959.61, $636.87 and $155.77 for the taxable years 1972, 1973 and 1974, respectively. Since the petitioners offered no evidence to show that they incurred such expenses, we hold that they have failed to carry their burden of proof. Therefore, we sustain respondent's determination with respect to these items. Issue 7. Self Employment Taxes
Respondent determined that the petitioner is liable for self-employment tax on his distributive share of the earnings of the T & J Enterprises partnership for 1972, 1973 and 1974. Petitioner contends that the business receipts generated by T & J Enterprises was rental income not subject to self-employment tax under sections 1401 and 1402. In this regard he points to a purported lease of the massage parlor facility to John Lee in August 1973 whereby Lee leased the premises from T & J Enterprises for a "percentage *487 of receipts" rent. He also argues that prior to such lease with Lee the partnership leased individual spaces at the massage parlor to the "girls" who paid "rent." T & J Enterprises, however, paid for all towels and sheets used in the business during such period. We find the arguments specious. In view of the fact that Lee was paid a salary by T & J Enterprises, that the partnership employed a certified public accountant to prepare payroll records and take care of payroll taxes for the Harem, and that Lee provided detailed records of receipts to Antonello, we think the purported lease agreement was a sham. Moreover, in some respects we regard Antonello's testimony as unworthy of belief. In addition, the license to operate the massage parlor was in the names of Antonello and the petitioner. Thus, we conclude that the petitioner did not receive a share of "rents" from the partnership, but he received a share of the partnership's income derived from the active operation of a trade or business. Accordingly, he is liable for self-employment taxes under section 1401. We also hold that the petitioners are liable for self-employment taxes on the unreported portion of income derived from *488 their book store and peep show operation. In view of our resolution of the issues herein, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, unless otherwise indicated.↩
*. Since Antonello had no linen invoice records for July, August, and September 1972, respondent took the average of June and October, 1972 and applied that amount (1,564) to July, August and September. For the period October 1973 to June 1974 respondent utilized the gross receipt figures appearing in Lee's records. Petitioner visited the Harem Massage daily and examined Lee's records at least twice a month. He was paid his share of the receipts in cash on a weekly basis. T & J Enterprises paid all the expenses of operating the massage parlor, including Lee's salarly. T & J Enterprises retained Edward Baranov, a certified public accountant, to keep payroll records and prepare payroll tax returns for the massage parlor during 1973 and 1974. On their unsigned 1972 Federal income tax return the petitioners reported $7,369 as income from the T & J Enterprises partnership and used that amount in computing their social security self-employment tax. On their 1973 income tax return they reported $17,126 as "rental income" from the Harem Massage. On their 1974 income tax return the petitioners reported $12,128 as "rental income" from the Harem Massage. The amounts reported in 1973 and 1974 were not treated by them as being subject to self-employment tax and, accordingly, no self-employment tax returns were filed for those years. In his notice of deficiency the respondent determined that the petitioners understated their income from Harem Massage as follows: 1972
1973
1974
Gross Receipts
as computed by
respondent
$93,913.09
$143,821.44
$89,880.12
Less 40% paid
to masseuses
-37,565.24
-57,528.58
-35,952.05
Corrected Gross
Receipts
$56,347.85
$ 86,292.86
$53,928.07
Less Gross Receipts
Reported on Returns
-35,681.00 *
-35,207.00
-27,882.00
Unreported Income from
Harem Massage
$20,666.85
$51,085.86
$26,046.07
50% of Unreported
Income to
Petitioners
$10,333.43
$25,542.93
$13,023.04
* 1972 gross receipts reported consist of allowed expenses of $20,943 plus the taxable income reported.
**↩ For the period October 1973 to June 1974 respondent utilized the gross receipt figures appearing in Lee's records.
2. Comparable methods used by respondent in reconstructing gross income have been approved by the courts. See and compare Mitchell v. Commissioner, 416 F.2d 101, 102 (7th Cir. 1969), affg. T.C. Memo. 1968-137, Shades Ridge Holding Co. Inc. v. Commissioner, T.C. Memo. 1964-275, affd. sub. nom. Fiorella v. Commissioner, 361 F.2d 326 (5th Cir. 1966), 57Herkimer Street Corp. v. Commissioner, T.C. Memo. 1961-223, affd. per curiam 316 F.2d 726 (5th Cir. 1963); Agnellino v. Commissioner, 302 F.2d 797, 799 (3rd Cir. 1962); Newton v. Commissioner, T.C. 1970-103; and Stanoch v. Commissioner, T.C. Memo. 1959-132↩.