NICHOLAS VARANO and MARY VARANO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Varano v. Commissioner
Docket No. 1831-82.
United States Tax Court
T.C. Memo 1984-135; 1984 Tax Ct. Memo LEXIS 541; 47 T.C.M. (CCH) 1311; T.C.M. (RIA) 84135; March 19, 1984. William C. O'Brien, Jr., for the petitioners. Michael S. Adelman, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In a statutory notice of deficiency dated December 7, 1981, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax under sections 6653(a) [1] and 6653(b) as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(b)
1974
$6,548.89
$3,274.44
1975
4,859.17
2,429.58
1976
6,532.82
3,266.41
1977
10,440.56
5,220.28
1978
1,348.99
$67.45
*542 The additions to tax under section 6653(b) were determined against petitioner Nicholas Varano only. Petitioners have not sought redetermination of the deficiencies and additions to tax for the taxable year 1977. The issues for determination are: (1) Whether petitioners understated the net income from their pizza business and thereby understated their taxable income for each of the years 1974, 1975, 1976, and 1978; (2) Whether any part of the underpayment of tax, if any, for each of the taxable years 1974 through 1976 was due to fraud on the part of petitioner Nicholas Varano within the meaning of section 6653(b); and (3) Whether any part of the underpayment of tax, if any, for the taxable year 1978 was due to negligence or intentional disregard of rules and regulations on the part of petitioners within the meaning of section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated *543 and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Nicholas Varano (petitioner) and Mary Varano, husband and wife, resided in Gibbstown, New Jersey, at the time they filed their petition herein. Petitioners timely filed joint Federal income tax returns for the years 1974 through 1978 with the Internal Revenue Service Center, Holtsville, New York. Petitioner was born in Italy in 1938. His parents owned a farm, and petitioner's entire family, which included three sisters, worked on that farm. In 1956, petitioner, his mother, and a sister immigrated to the United States. They originally stayed with relatives in Mt. Carmel, Pennsylvania, and in 1958 they were joined by the rest of the family in Philadelphia, Pennsylvania. In 1959, petitioner and his parents purchased a house in Philadelphia. At that time, petitioner was employed by a clothing manufacturer, his father was employed as a construction worker, and his mother and sisters worked as seamstresses. The entire family pooled their wages earned from these various jobs, and common expenses were paid from this pool. In addition to his employment, petitioner *544 attended evening high school. He subsequently attended the Radio Electronic Institute, where he trained as an electronics technician. He has never taken a course in bookkeeping, accounting, or taxation. On October 10, 1960, petitioner was hired by Radio Corporation of America (RCA) as a wireman at a starting salary of $2.40 per hour. He was promoted in June of 1961, and his salary was increased to $2.85 per hour. On July 28, 1961, petitioner was granted a leave of absence for active military service. He resumed his employment at RCA on February 5, 1962, and remained there until August 3, 1962, at which time he was laid off. In September 1962, petitioner was hired by Aero Geo Astro Corporation (AGAC) in Washington, D.C. His position was that of lab technician at a salary of $120 per week. While employed by AGAC, petitioner paid $90 per month to share a room with a student at College Park, Maryland. On January 7, 1963, petitioner returned to Philadelphia to join Boeing Vertol Company (Boeing) as an electrical bench assembler. Her starting salary was $2.55 per hour, and the maximum salary that he earned at Boeing was $3.13 per hour. In the summer of 1964, petitioner, *545 who at that time was engaged to Mary, purchased a house in Camden, New Jersey, for $10,500. Upon moving into the Camden house, petitioner had his name removed from the title to the Philadelphia house so that title to the latter property was held solely in the names of his parents. Petitioner received no compensation for this transaction. On October 4, 1964, petitioner and Mary were married. Petitioner continued to work at Boeing, and Mary worked in the trust department of Camden Trust Bank. In May of 1966, petitioner left Boeing to rejoin RCA at a salary of $3.18 per hour. Petitioners' only child, Nancy, was born January 28, 1967. Shortly before that date, Mary terminated her employment with the Camden Trust Bank, and since that time and through at least 1978, she has held no other employment for which she was paid wages. In January 1968, petitioner was promoted, but approximately 2 months later, he was again laid off by RCA. Petitioner then searched unsuccessfully over a 3 to 4 week period for similar employment. In May of 1968, he purchased a pizza business in Gibbstown, New Jersey for $2,500 and opened that business under the name of Nick's Pizzeria (the pizzeria). *546 From the time that the pizzetia was acquired through 1978, petitioner operated the business with some assistance from Mary, but without the help of any employees. The hours of operation were 10:00 a.m. to 12:00 midnight on Tuesdays through Fridays, and 12:00 noon to 12:00 midnight on weekends. The pizzeria was closed Mondays. In addition to pizza, the menu included sandwiches, a few entrees such as spaghetti and chicken, and soft drinks. Shortly after purchasing the pizzeria, petitioner was contacted by Alfred P. Clark, an accountant doing business as Garden Accounting Service, who suggested the accounting system used for the pizzeria. Petitioner determined his gross sales by personally counting the cash on a nightly basis and entering an amount purportedly representing the sales for each business day on a calendar provided by Clark. All of the calendar entries were in whole dollars (i.e., they did not include cents), and each entry ended in a five or a zero. Petitioner was the only person who counted the cash and made the calendar entries. No cash register tape or sales invoices were maintained. Expenses were determined from receipts obtained at the time of purchases. The *547 vast majority of expenses was paid in cash; no business checking account was maintained. At the end of each month petitioner sent his calendar representing sales and the expense receipts to Garden Accounting Service. Clark or a subordinate used these figures to prepare monthly profit and loss statements. Sometime in 1969, petitioners sold their Camden house for $15,500 and rented an apartment in Gibbstown. The net proceeds from this sale were invested in a certificate of deposit. The apartment, which was located approximately two blocks from the pizzeria, cost $90 per month. In July 1973, they purchased a house in Gibbstown for $30,000. Petitioner initially sought mortgage financing for this purchase, but after he learned the rate of interest demanded by his bank, he chose to pay the entire purchase price in cash. Petitioner redeemed certificates of deposit totaling approximately $20,000 to help pay for the house. Petitioners' tax returns for the years 1968 through 1978 were prepared by Clark. In preparing these returns, Clark relied entirely on information provided by petitioner; no independent verification or audit of this data was made. Most of the information was *548 obtained from annual personal interviews of petitioner by Clark. Income and expenses relating to the pizzeria were determined on the cash basis from the cumulative totals of the monthly profit and loss statements. Before entering these totals on the Schedule C attached to each return, however, Clark made several adjustments that increased net income. These adjustments may be summarized as follows: Adjustment
Items withdrawn
Business
from business for
Purchases
Inventory
Sales
Year
personal use
[Decrease]
[Increase]
[Increase]
1968
$700
1969
1,000
1970
1,000
1971
1,000
1972
1,200
$1,000
1973
500
1974
500
$4,000
1975
500
1,000
$2,000
1976
1,000
1977
500
1,000
1978
500
1,500
Clark determined the classification and estimated the amount of the adjustments, and each of the adjustments was discussed with petitioner.
It was the customary practice of Clark and his subordinates to ask during the annual personal interview whether all income had been disclosed for that particular year. Petitioner never indicated to Clark that any income had not been reported. The gross revenues, total expenses, *549 and net income reported by petitioners on their Schedule C's, and the amount of revenue expressed as a percent of expenses were as follows: Gross
Total
Net
Revenue as a
Year
Receipts
Expenses
Income
Percent of Expense
1968
$8,704.87
$8,602.78
$102.09
101%
1969
12,429.05
10,142.55
2,286.50
123%
1970
13,452.00
10,090.57
3,361.43
133%
1971
14,883.00
9,484.54
5,398.46
157%
1972
15,795.00
10,483.70
5,311.30
151%
1973
23,494.00
15,990.97
7,503.03
147%
1974
13,900.00
9,256.56
4,643.44
150%
1975
16,015.00
10,398.04
5,616.96
154%
1976
13,735.00
8,381.48
5,353.52
164%
1977
15,800.00
9,341.57
6,458.43
169%
1978
18,330.00
7,991.98
10,338.02
229%
In December 1978, Special Agent Arnold D. Hitt, III, and Internal Revenue Agent Felix R. Donato were assigned to conduct a joint civil and criminal investigation of petitioners' 1976 and 1977 tax returns. Hitt and Donato first interviewed petitioner on March 14, 1979, at the pizzeria. After introducing themselves and explaining to petitioner his constitutional rights, the agents inquired as to the type of records kept by petitioner and how he prepared his Federal *550 income tax returns. Petitioner thereupon described the manner in which the sales and expenditures of the pizzeria were recorded.Petitioner also stated, inter alia, that he managed to accumulate a substantial amount of cash from his employment prior to the purchase of the pizzeria, that the largest amount of undeposited cash that he had at any time during 1976 and 1977 was a "couple thousand" dollars, that neither he nor his wife had received any nontaxable income, and that all of his income was reported on his 1976 and 1977 returns. On January 14, 1980, agents Hitts and Donato again met with petitioner at the pizzeria. At that time petitioner was informed that the joint investigation of his tax liability had been expanded to include all taxable years 1974 through 1978, and he was again informed of his constitutional rights. In response to the agents' inquiry as to the source of the $30,000 used to make the cash purchase of the Gibbstown house in July of 1973, petitioner stated that approximately $20,000 was from the redemption of certificates of deposit and that the balance was from undeposited cash saved from his prior employment. When asked why he redeemed the interest-bearing *551 certificates of deposit to purchase the house rather than use undeposited cash, petitioner replied that he didn't have $20,000 to $30,000 of undeposited cash. Petitioner refused to answer further inquiries as to the amount and location of that undeposited cash. Petitioner did state that neither he nor his wife had received any substantial gifts or inheritances, that all purchases of assets had been made solely with their own funds, and that he had always reported all his income on his tax returns. The interviews with petitioner and the meager character of petitioner's bookkeeping prompted respondent's agents to obtain various third-party records and prepare various schedules, which were finally incorporated into a schedule of petitioners' net worth as of the beginning and end of each of the years 1974 through 1978. In that schedule, respondent determined that petitioners' beginning net worth as of January 1, 1974, was $84,275.20, which included undeposited cash of $19,560.28. Respondent's net-worth analysis concluded that petitioners' net worth had increased steadily from $84,275.20 on January 1, 1974, to $183,713.56 on December 31, 1978, and it ultimately concluded that petitioners *552 failed to report the following amounts of taxable income: Year
Unreported Income
1974
$23,699.93
1975
17,866.28
1976
22,315.09
1977
30,288.52
1978
3,938.09
This analysis was the basis for the notice of deficiency sent to petitioners on December 7, 1981, that determined the deficiencies and additions to tax set forth above. [2]
On July 17, 1981, petitioner was convicted, on a plea of guilty, of violation of section 7201 (criminal tax evasion) for the taxable year 1977. OPINION I. Unreported Income
The first issue for resolution is whether petitioners underreported their taxable income for each of the years 1974, 1975, 1976, and 1978. In this case, of course, the evidence of unreported income consists of respondent's net worth analysis. The validity of that analysis must be examined by applying the standards set forth in Holland v. United States,348 U.S. 121, 129 (1954) *553 and United States. v Massei,355 U.S. 595 (1958). Under those standards, respondent must establish, with reasonable certainty, an opening net worth; and he must establish either that a likely source of unreported income existed or that he conducted a reasonable investigation of leads to negate the existence of nontaxable sources of income. Respondent contends, and petitioners deny, that he has met each of these requirements. A. Opening Net Worth
Respondent determined that petitioners' net worth as of January 1, 1974, was $84,275.20, which included undeposited cash on hand of $19,560.28. The only item in that determination challenged on brief by petitioners is the amount of undeposited cash. They argue that respondent's computation was arbitrary and that they possessed a cash "hoard" well in excess of $19,560.28. Respondent computed the amount of undeposited cash by tracing the source and application of petitioner's funds for each of the years 1960 through 1973. Information for 1964 through 1973 was taken from petitioners' tax returns, but respondent was unable to locate any returns filed by petitioner for 1960 through 1963. Income for those years *554 was calculated from records maintained by petitioners' employers. Expenditures were computed from documented cash flow; nondocumented items such as living expenses were not included. Based on this information, respondent initially concluded that the amount of undeposited cash was $7,639.23. Respondent discovered, however, that petitioners purchased stock in January of 1974 for $19,560.28. Because he was unable to trace the source of these founds to any specific assets or increase in liabilitis, respondent increased his determination of cash on hand to that amount. Petitioners do not dispute the logic of respondent's source and applications of funds analysis. They argue that his conclusion was arbitrary because respondent failed to establish the source of the cash used to purchase the stock in January of 1974. Respondent's computations led to a conclusion that the amount of undeposited cash possibly attributable to savings from petitioner's prior employment was approximately $7,600. In making his computations, respondent relied, in part, on statements by petitioner including the statement that neither petitioner nor his wife had ever received any inheritances or substantial *555 gifts. An adjustment, made in petitioner's favor, to take account of evidence that petitioner spent $19,560.28 in January 1974 is in no way arbitary. Petitioners next argue that their cash hoard as of January 1, 1974, was well in excess of $19,560.28. They have not, however, stated how much was on hand on that or any other date. They assert that the source of this cash was money saved from employment prior to the purchase of the pizzeria and from wedding gifts. The only evidence that supports this argument, however, is the self-serving, uncorroborated testimony of petitioner at trial that they had received $10,000 in cash as wedding presents. This testimony was inconsistent with his prior statements to respondent's agents. When questioned by respondent's agents as to why he withdrew approximately $20,000 from interest-bearing certificates of deposit to purchase the Gibbstown house in July of 1973 rather than use his undeposited cash, petitioner replied that he did not have $20,000 to $30,000 of undeposited cash. Petitioner now asks us to disregard that statement, made to agents investigating him for tax fraud, and to conclude, based only in his testimony, that approximately *556 5 months after the purchase of the house he possessed undeposited cash well in excess of $19,560.28. In view of the fact that petitioner has failed to offer an adequate explanation for these inconsistencies, we do not accept petitioner's testimony. Here, as with respect to all of his testimony, his conviction of the felony of tax evasion may also be considered in assessing his credibility. See Rule 609, Federal Rules of Evidence.
Respondent is not required to establish petitioners' opening cash balance with mathematical exactitude; he need only establish that balance with reasonable certainty. Holland v. United States,supra. Respondent has shown with reasonable certainty that petitioners' undeposited cash balance as of January 1, 1974, was $19,560.28 and that their net worth as of that date was $84,275.20. Accordingly, respondent's determination as to this issue is sustained. B. Likely Source of Unreported Income
Respondent contends that petitioners failed to report all of their revenue from the pizzeria. He does not challenge the amount of expenses relating to that business. Petitioners counter that the *557 gross revenue from the pizzeria was accurately reflected in their returns. All of the returns at issue herein were prepared by petitioners' accountant, Clark, who relied entirely upon information supplied by petitioner. Several factors in this case indicate that this information was inaccurate and lead to the conclusion that the returns failed to include all revenue from the pizzeria. First, the reliability of petitioner's accounting system for revenues depended entirely on the accuracy of his daily calendar entries.Petitioner was the only person who counted the cash and made these entries, and no other record of sales, such as cash register tapes, was maintained. The fact that each of these entries was made in whole dollars and ended in a five or a zero casts doubt as to their accuracy. Second, the fact that Clark felt compelled to make substantial adjustments to petitioners' information that increased the net income of the pizzeria in each of the years 1968 through 1978 indicates that the information was inaccurate. These adjustments, each of which was in a multiple of 100, were merely based on estimates. Clark claimed that the reason for these adjustments was that petitioner's *558 information resulted in a markup that was at variance with Internal Revenue Service statistics for comparable businesses, and he wished to avoid an audit. This explanation fails to account for the magnitude of the adjustments in relation to the reported Schedule C net income (e.g., the 1974 adjustments totaled $4,500 and the reported net income for that year after that increase was only $4,643.44). When petitioners were subsequently subjected to an audit, they did not claim that their taxable income was in fact substantially less than reported. The logical inference to be drawn is that the adjustments were made, in part, because Clark questioned whether petitioner's calendar entries correctly reflected income. The first year in issue in this case followed a year in which petitioner's reported gross receipts from the pizzeria increased 49 percent and his reported net income increased 41 percent over the prior year. The pattern of the earlier returns is consistent with petitioner's testimony that many problems had to be overcome in the early years. The returns for the years in issue, however, do not reflect the increased profitability that, according to his testimony, was realized *559 after the first 5 years of operation. Finally, a comparison of the Schedule C of petitioners' 1978 return with those of their preceding returns suggests that all revenue from the pizzeria was not reported. The 1978 return was the first return filed by petitioners after respondent's agents began their investigation of petitioners' 1976 and 1977 tax liability. Although the total reported expenses relating to the pizzeria were less in 1978 than in the years 1974 through 1977, the reported gross revenues for that year were substantially greater than the revenues of the preceding years. Stated differently, gross revenues expressed as a percent of total expenses in each of the years 1974 through 1977 ranged from 150 percent to 169 percent. In 1978, however, gross revenues leaped to 229 percent of total expenses. Petitioners offered no explanation for the discrepancy between the Schedule C for 1978 and those for the four preceding years. Based on these factors and on the entire record herein, we conclude that respondent has established that cash receipts from the pizzeria were a likely source of unreported income. C. Negation of Nontaxable Sources of Income
Petitioners *560 concede that they acquired substantial assets during the years 1974 through 1978. They contend, however, that these assets were acquired, in part, with funds from "nontaxable" sources as follows: (1) Previously taxed savings from wages earned prior to the purchase of the pizzeria, (2) wedding gifts, (3) gifts from petitioner's parents, and (4) profits from the family farm in Italy. It is not clear from their brief whether petitioners claim that they received income from the farm in Italy, or whether petitioners claim that petitioner's parents received income from that farm and subsequently made gifts to petitioners. To be complete, both possibilities are discussed. Petitioners explicity disclaim that funds were received from loans or inheritances. Of the four claimed sources of funds, the first two (i.e., savings from wages and wedding gifts) were acquired, if at all, prior to 1974 and have already been considered in our determination of petitioners' net worth as of January 1, 1974. Accordingly, no further discussion of those items is warranted here. Petitioner's assertion that he received substantial gifts from his parents was offered for the first time at trial, and it *561 is inconsistent with his earlier statements to respondent's agents that neither he nor his wife had received any substantial gifts. No other admissible evidence, such as gift tax returns, cancelled checks, or the testimony of others, was offered to corroborate this claim. Petitioner did testify that his parents' health precluded them from acting as witnesses on his behalf, but this does not explain his failure to offer the testimony of others, such as petitioner's wife, or other corroborating evidence. The final alleged source of funds, income from the family farm in Italy, was similarly offered for the first time at trial. Assuming, arguendo, that petitioners did receive income from that farm, such income would be fully taxable to them. Section 61(a). Because petitioners did not include that income on their returns, they are again faced with inconsistent statements, and we are not persuaded that these belated claims should be accepted. D. Taxable Income
Petitioners finally argue that even if we were to conclude that respondent has met the necessary criteria for using the net worth method, respondent's computations under that method were in error and should therefore *562 be disregarded. They assert that respondent erred in determining the amount of their living expenses and that the pizzeria was too small to produce the taxable income claimed by respondent. For the reasons stated below, we reject these arguments.
Respondent used statistics published by the United States Department of Labor, Bureau of Labor Statistics, adjusted for a family of three, in conjunction with the Consumer Price Index to determine petitioners' living expenses for each of the years in issue. This Court has previously upheld the use of such statistics to establish living expenses. See, e.g., Giddio v. Commissioner,54 T.C. 1530 (1970). Petitioner, on the other hand, did not produce any documentation to support their dispute with respondent's determination, nor did they produce their own schedules of living expenses. As respondent has presented a prima facie case and petitioners have failed to come forward with sufficient evidence to rebut his claim, respondent's determination as to living expenses must be upheld. Petitioner's second assignment of error, i.e., that the pizzeria was too small to produce the taxable income claimed by respondent, is similarly *563 unsupported by the record. Petitioners have provided us with neither a net worth schedule of their own nor the testimony or resport of an expert in support of their argument. Accordingly, respondent's determination as to petitioner's taxable income for each of the years at issue herein is sustained. II. Additions to Tax for Fraud
The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion *564 of this Court. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without pubished opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969).
Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner,225 F.2d 216, 220 (6th Cir. 1955). A pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud as to each of the years. Holland v. United States,supra at 129; Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971); *565 Agnellino v. Commissioner,302 F.2d 797 (3d Cir. 1961); Otsuki v. Commissioner,supra.
Having concluded that taxable income was understated in each of the years in issue, we are compelled by several factors to conclude that such understatement was due to fraud. In particular, the pattern of acquisition of substantial assets while reporting relatively nominal business income on his returns convinces us that petitioner knew that he had substantially understated his income and substantially underpaid his tax. Petitioner's statements to respondent's agents and his testimony at trial contained many inconsistencies and incredible assertions. For example, he initially claimed that neither he nor his wife had received any substantial gifts. Petitioner's statements to this effect, made to agents investigating him for tax fraud, cannot be reconciled with his testimony that that they had received substantial wedding gifts and other substantial gifts from his parents. Similarly, it was Clark's practice to always ask his clients whether all taxable income had been disclosed to him. Petitioner never informed Clark that all taxable income had not been *566 disclosed. Such conduct is a strong indication of the intent to mislead or conceal that is a predicate to the imposition of the additions to tax for fraud. Taking into account respondent's burden of proof as to fraud, there comes a time when petitioner must come forward with evidence in support of his claimed defenses. Petitioner's failure to come forward with other evidence in support of his contentions that would adequately explain the incriminating evidence justifies the inference that such evidence does not exist or would be unfavorable to him. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946). Review of the entire record in this case convinces us that the additions to tax for fraud for the years 1974, 1975, and 1976 should be sustained. III. Additions to Tax for Negligence
An addition to tax under section 6653(a) is imposed if any part of any underpayment of tax is due to negligence or intentional disregard of rules or regulations. Petitioners have the burden of proving error in respondent's determination that such an addition to tax should be imposed against him. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); *567 Rule 142(a). Petitioners did not address this issue on brief. Therefore, respondent's determination is sustained. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
2. Respondent asserted for the first time on brief that the amount of unreported income in each of the years was greater than the amount determined in his notice of deficiency. Because respondent has failed to follow the proper procedures for presenting such an issue, we do not consider this contention.↩